**Terry Lee GOODWIN, Petitioner,**

v.

**Charles BALKCOM, Warden, Respondent.**

**No. 81–7132.**

United States Court of Appeals, Eleventh Circuit.

Sept. 3, 1982.

As Modified Nov. 1, 1982.

Bowen, Derrickson, Goldberg & West, Frank L. Derrickson, Thomas M. West (court appointed), Alice C. Stewart, Atlanta, Ga., for petitioner.

Harrison Kohler, William B. Hill, Jr., Asst. Atty. Gen., Atlanta, Ga., for respondent.

Before INGRAHAM *, HATCHETT and ANDERSON, Circuit Judges.

HATCHETT, Circuit Judge:

Terry Lee Goodwin appeals the district court's denial of his habeas corpus petition challenging his state convictions for murder and armed robbery. The petition alleges, in addition to other things, that Goodwin was denied effective assistance of counsel at his state trial in violation of the sixth amendment, and that the state trial court's capital sentencing instructions were constitutionally inadequate. Agreeing with Goodwin on these allegations, we reverse and remand.

## I. FACTS

On Wednesday evening, April 9, 1975, eighteen-year-old Terry Lee Goodwin and seventeen-year-old Brad Studdard played pool at the Snack and Rack Recreation Parlor in Monroe, Georgia. After leaving the poolroom in Studdard's car about 10:30 p.m., the youths drove to a convenience store to purchase beer. As they drove into the country, they talked, drank beer, and smoked marijuana. Finishing the beer,

* Honorable Joe M. Ingraham, U. S. Circuit Judge for the Fifth Circuit, sitting by designation.

Studdard parked the car along a dirt road to urinate. Goodwin exited the vehicle, pulled a butcher knife from his pocket, and demanded that Studdard give him the car. When Studdard refused, Goodwin marched Studdard into the woods nearby and repeated his demand. Studdard again refused and attempted to flee but tripped and fell to the ground. Goodwin pursued Studdard and stabbed him approximately eighteen times. Goodwin left Studdard in the woods where he died from loss of blood.

Goodwin drove the car back to town and abandoned it near his residence. Sheriff's deputies discovered the car on Thursday afternoon. On Friday, Goodwin phoned the Studdard residence to inquire about Brad's disappearance. Although he did not identify himself, Goodwin claimed to be a friend of Brad's and asked if a reward was being offered. The victim's sister told Goodwin that money could be raised for information concerning her brother's whereabouts. Goodwin phoned again later and, claiming to be "John Smith," told Brad's sister he had heard something about Good Hope Road (a road near the dirt road where the killing occurred). A local radio station received several calls that same day from Goodwin, again identifying himself as John Smith, asking about a reward, and advising the search party to look near Good Hope Road. At approximately 12:30 a. m. on Saturday, sheriff's deputies, acting on a tip from an unidentified woman who purportedly overheard Goodwin admit to the killing, went to Goodwin's house. Goodwin's mother came to the door and the deputies told her they wanted to talk to Terry. After she let them in, one deputy went into Goodwin's bedroom and, awakening him, told him "to get up and get your clothes on," and to accompany them to the station for questioning. He complied.

Upon being advised of his constitutional rights, Goodwin told the deputies that a friend had told him to look for Studdard's body near the same dirt road where Goodwin and Studdard had stopped on Wednesday evening. On Saturday afternoon, Goodwin accompanied deputies to this location, and the deputies discovered the body. That same afternoon, deputies secured a search warrant for Goodwin's house and upon executing it, found a bloodstained coat containing items belonging to Studdard. The deputies found the keys to the victim's car under a rug. When confronted with this physical evidence on Saturday evening, Goodwin confessed to the killing. The next morning (Sunday), deputies returned to the scene of the crime and found the butcher knife across the road from where Studdard's body had been located.

The Walton County, Georgia, grand jury indicted Goodwin on charges of murder and armed robbery. Because he was indigent, the court appointed him counsel. At trial in the Walton County Superior Court, the defense presented evidence to show that Goodwin's reduced mental capacity made it impossible for him to knowingly waive his fifth amendment rights prior to confessing to the crimes.[1] The trial court rejected this approach, and Goodwin was convicted of the offenses and sentenced to death. On appeal and mandatory death sentence review, the Supreme Court of Georgia affirmed his conviction and sentence.[2] *Goodwin v. State*, 236 Ga. 339, 223 S.E.2d 703 (1976), *cert. denied*, 432 U.S. 911, 97 S.Ct. 2961, 53 L.Ed.2d 1085 (1977).

Represented by different counsel, Goodwin filed an extraordinary motion for new trial in Walton County Superior Court.

1. Eleven days after Goodwin confessed to the crimes, the Walton County Superior Court ordered Goodwin confined to the Central State Hospital at Milledgeville, Georgia, for a psychiatric evaluation. Goodwin remained at the hospital approximately three months. An examining psychiatrist testified that Goodwin's I.Q. was eighty-one and diagnosed him to be "borderline mental retardation." He classified Goodwin's mental age at approximately fourteen years. A school psychologist who examined Goodwin a few days before trial testified that, in her opinion, Goodwin's mental age was nine years six months. Her examination placed Goodwin's I.Q. at fifty-eight.

2. Georgia's capital sentencing procedure requires all death sentences be reviewed by the Georgia Supreme Court. Ga.Code Ann. § 27–2537.

The Georgia Supreme Court affirmed the denial of this motion. *Goodwin v. State*, 240 Ga. 605, 242 S.E.2d 119 (1978). Goodwin then petitioned the Superior Court of Tattnall County for a writ of habeas corpus alleging that errors of constitutional magnitude rendered his trial fundamentally unfair. The court denied the petition after an evidentiary hearing, and the Georgia Supreme Court affirmed the denial. *Goodwin v. Hopper*, 243 Ga. 193, 253 S.E.2d 156 (1979).

Having exhausted all available state remedies, Goodwin sought habeas corpus relief in the United States District Court for the Middle District of Georgia under 28 U.S.C.A. § 2254 (1976). The district court 501 F.Supp. 317 ordered Goodwin's execution stayed pending resolution of the habeas corpus action. The court referred the petition to a magistrate who, without holding an evidentiary hearing, submitted proposed findings of fact and conclusions of law to the district court. Believing the jury instructions regarding the imposition of the death penalty were constitutionally infirm, the magistrate recommended that Goodwin's death sentence be vacated, but in all other respects, Goodwin's conviction should stand.[3] Both parties filed objections to the magistrate's recommendations. The district court adopted the majority of the magistrate's recommendations, but reached a different conclusion on the jury instructions issue and denied habeas corpus relief. This appeal followed.

## II. ISSUES ON APPEAL

On appeal, Goodwin urges us to consider a number of issues which, either standing alone or in conjunction with his predominate claim of ineffective assistance of counsel, require the vacating of his conviction and death sentence. Goodwin contends (1) that he was illegally arrested; (2) that his confession was not the product of a know-

ing and intelligent waiver of his fifth amendment rights; (3) that four veniremen were improperly excluded in violation of *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968); (4) that he was denied effective assistance of counsel at his state trial; (5) that the state trial court's jury instructions shifted the burden of proof to Goodwin and failed to define "capital felony" thus depriving him of a jury adequately guided in its deliberation; (6) that the state trial court's capital sentencing instructions were unconstitutional because they failed to instruct on the consideration of mitigating circumstances and the option to recommend against death; (7) that his federal habeas corpus petition was improperly denied without the benefit of an evidentiary hearing because the state habeas corpus proceeding did not adequately develop the factual issues in a full and fair hearing; and (8) that the death penalty violates the eighth amendment because it is administered in an irregular and capricious fashion. Addressing only those contentions we deem dispositive of the case, we must decide whether the trial court's capital sentencing instructions were constitutionally insufficient and whether Goodwin was denied effective assistance of counsel in violation of the sixth amendment. Our resolution of these two issues makes discussion of the other issues unnecessary.

## III. CAPITAL SENTENCING INSTRUCTIONS

In the sentencing phase of Goodwin's trial subsequent to the jury's verdict of guilty on the murder and armed robbery charges, the trial court allowed presentation of evidence of aggravating and mitigating circumstances. The state presented documentary evidence of Goodwin's 1974 forgery convictions. Goodwin presented no evidence at this phase of the case. Following jury arguments by counsel for both sides, the trial court instructed the jury:

---

**3.** The magistrate was not the first to attack the infirmities of the trial court's sentencing charge. In the appeal of his state habeas corpus petition to the Georgia Supreme Court, Justices Hill and Marshall, troubled by the lack of instruction on the option to recommend life imprisonment, dissented "in the belief that [Goodwin] should be given a retrial as to sentencing." *Goodwin v. Hopper*, 243 Ga. 193, 197, 253 S.E.2d 156, 159 (1979) (Hill, J., dissenting).

Ladies and Gentlemen of the Jury, you having found the defendant guilty of the offense of murder and armed robbery, it is now your duty to determine within the limits prescribed by law, the penalty that shall be imposed as punishment for that offense.

In reaching this determination, you are authorized to consider all of the evidence received by you in open court in both phases of this trial. You are authorized to consider all of the facts and circumstances of the case.

Under the laws of this state, every person guilty of the offense of murder or armed robbery shall be punished by life in the penitentiary or death by electrocution. And under the laws of this state, every person guilty of the offense of armed robbery shall be punished by life in the penitentiary or death by electrocution or by from one to twenty years in prison.

In the event that your verdict is life in prison, the punishment the defendant would receive would be imprisonment in the penitentiary for and during the remainder of his natural life. If that be your verdict, you would add to the verdict already found by you, an additional verdict as follows: "And we fix his punishment as life imprisonment."

If you decide—excuse me, let me begin again. If you should decide to sentence the defendant for the offense of armed robbery, then the form of your verdict would be, "We, the Jury, sentence the defendant to 'blank' years," and where the court has used the term 'blank', you would insert the term of years to which you sentence this defendant for the offense of armed robbery.

You may, however, if you see fit and if that be your verdict, fix his punishment as death for murder, which would require a sentence by the court of death by electrocution.

I charge you that before you would be authorized to find a verdict fixing a sentence of death by electrocution, you must find evidence of statutory aggravating circumstances as I will define to you later in the charge, sufficient to authorize the supreme penalty of the law.

I charge you that a finding of statutory aggravating circumstances or circumstances [sic] shall only be based upon evidence convincing your minds beyond a reasonable doubt as to the existence of one or more of the following factual conditions in connection with the defendant's perpetration of the act for which you have found him guilty. They are: Number one, the offense of murder was committed while the offender was engaged in the commission of another capital felony.

Two, the offender committed the offense of murder for himself or another, for the purpose of receiving money or any other thing of monetary value.

The statutory instructions that you are authorized to consider will be submitted in writing to you, the Jury, for your deliberations. If your verdict should be a recommendation of death, you would add to the verdict already found by you, an additional verdict as follows: "And we fix his punishment as death." Additionally, you must designate in writing the aggravating circumstance or circumstances which you find beyond a reasonable doubt.

Your verdict should be agreed to by all twelve of your members. It must be in writing, entered upon the indictment, dated, and signed by your foreman or forelady and returned into court for publication.

Now if you fix a sentence for murder, the offense of armed robbery would merge with the offense of murder and you would not need to specify any sentence for the offense of armed robbery.

You could not set a sentence for both offenses of armed robbery and murder, but must select which offense you desire to sentence—to which you desire to sentence the defendant.

You may now retire to the Jury Room, elect one of your number as foreman or forelady, and begin your deliberations. These instructions, by law, are to be sent out by you. At the last minute, I made

some changes in my own handwriting. And I do not mean to be facitious at this grave stage of this trial, but it might be that you cannot read my writing. And if so, if you will please tell the Bailiff, I will have them typed.

You may now retire to the Jury Room and begin your deliberations.

■ Goodwin argues that this charge runs contrary to the guidelines established in *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (plurality opinion), and *Bell v. Ohio,* 438 U.S. 637, 98 S.Ct. 2977, 57 L.Ed.2d 1010 (1978) (plurality opinion), and adhered to by this court's predecessor in *Chenault v. Stynchcombe,* 581 F.2d 444 (5th Cir. 1978). Specifically, Goodwin contends that these instructions did not adequately focus the jury's attention on the consideration of mitigating circumstances and the option of recommending a life sentence even if aggravating circumstances were found.[4] According to Goodwin, these inadequacies violate the eighth and fourteenth amendments to the United States Constitution. We review Goodwin's contentions in light of the standard by which state court jury instructions are judged in federal

habeas corpus proceedings. Singular aspects of the charge may not be viewed in isolation. *Cupp v. Naughton,* 414 U.S. 141, 146–47, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973). Instead, the federal appellate court must examine the charge as a whole to determine the adequacy of the instructions. *Davis v. McAllister,* 631 F.2d 1256, 1260 (5th Cir. 1980), *cert. denied,* 452 U.S. 907, 101 S.Ct. 3035, 69 L.Ed.2d 409 (1981); *Stephens v. Zant,* 631 F.2d 397, 405 (5th Cir. 1980), *modified on other grounds on panel rehearing,* 648 F.2d 446 (5th Cir. 1981), *cert. granted,* 454 U.S. 1035, 102 S.Ct. 575, 70 L.Ed.2d 480 (1982) (case certified to Georgia Supreme Court).

Our resolution on the constitutionality of these instructions is significantly aided by the discussion given this topic in *Spivey v. Zant,* 661 F.2d 464 (5th Cir. 1981), *cert. denied,* —— U.S. ——, 102 S.Ct. 3495, 73 L.Ed.2d 1374 (1982).[5] In *Spivey,* an almost identical charge was found deficient because it failed to guide the jury in the consideration and understanding of the nature and function of mitigating circumstances.[6] Holding that the eighth and four-

---

**4.** Goodwin cites as mitigating circumstances his age, race, reduced mental capacity, social, economic, and family background. Evidence of these circumstances was presented during the guilt phase of trial through testimony of Goodwin's mother, a school psychologist, and the state's psychiatrists.

**5.** *Spivey v. Zant* is binding on this circuit as a post-September 30, 1981, decision of a Unit B panel of the Former Fifth Circuit. See *Stein v. Reynolds Securities, Inc.,* 667 F.2d 33 (11th Cir. 1982).

**6.** The trial court charged the jury in *Spivey v. Zant* as follows:

Ladies and gentlemen, you have found the defendant guilty of the offense of murder. It is now your duty to determine, within the limits prescribed by law, the penalty that shall be imposed as punishment for that offense. In reaching this determination you are authorized to consider all the facts and circumstances of the case.

Under the laws of this State, every person guilty of the offense of murder, shall be punished by life in the penitentiary, or death by electrocution.

I charge you that before you would be authorized to find a verdict fixing a sentence

of death by electrocution, you must find evidence of statutory aggravating circumstances, as I will define to you later in the charge, sufficient to authorize the supreme penalty of the law.

I charge you that a finding of statutory aggravating circumstance shall only be based upon evidence convincing your mind beyond a reasonable doubt as to the existence of one, or of the factual condition in connection with the defendant's perpetration of acts for which you have found him guilty. [Sic]

Now, the law provides certain aggravating circumstances which you may consider for this purpose. If the offense of murder was committed while the offender was engaged in the crime of another capital felony, in this case, the capital felony charged by the State is that of armed robbery, I have given you in charge, you have received the definition of armed robbery.

The statutory instructions that you are authorized to consider will be submitted in writing to you the jury for your consideration. If you fix his punishment as death, you must also designate in writing that aggravating circumstance which you find beyond a reasonable doubt.

Your verdict must be agreed to by all twelve of your members, it must be in writ-

teenth amendments require clear instructions which do not preclude the consideration of mitigating circumstances, the *Spivey* panel explained that,

> [i]n most cases, this will mean that the judge must clearly and explicitly instruct the jury about mitigating circumstances *and the option to recommend against death;* in order to do so, the judge will normally tell the jury what a mitigating circumstance is and what its function is in the jury's sentencing deliberations.

*Spivey,* 661 F.2d at 471 (emphasis added, footnote omitted).

The imposition of the death penalty under Georgia's current death penalty statute has been upheld by the United States Supreme Court. *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (plurality opinion). In *Gregg,* the Court approved of Georgia's revised statute because although "some jury discretion still exists, 'the discretion to be exercised is controlled by clear and objective standards so as to produce nondiscriminatory application.'" *Gregg,* 428 U.S. at 198, 96 S.Ct. at 2936, *quoting Coley v. State,* 231 Ga. 829, 834, 204 S.E.2d 612, 615 (1974). The *Gregg* plurality further noted that discretion is not fully accorded the sentencer unless it is exercisable in an informed manner. "[W]here discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capri-

cious action." *Gregg,* 428 U.S. at 189, 96 S.Ct. at 2932.

Subsequent announcements from the Supreme Court have amplified the constitutional strictures on sentencing instructions. In *Lockett v. Ohio* and *Bell v. Ohio,* a plurality held the Ohio death penalty statute unconstitutional because it precluded the sentencer from considering individualized, mitigating factors as required by the eighth and fourteenth amendments. Like the charge in *Spivey,* Goodwin's jury was never affirmatively precluded from considering any mitigating circumstances. This is not, however, the extent of our interpretation of *Lockett* and *Bell.* The rule from those decisions requires explicit instructions on mitigation *and* the option to recommend against death. In *Chenault v. Stynchombe,* the court concluded:

> This constitutional requirement to allow consideration of mitigating circumstances would have no importance, of course, if the sentencing jury is unaware of what it may consider in reaching its decision. We read *Lockett* and *Bell,* then, to mandate that the judge clearly instruct the jury about mitigating circumstances and the option to recommend against death.

*Chenault,* 581 F.2d at 448.

█ In this circuit, then, the state of the law is well settled. Capital sentencing instructions which do not clearly guide a jury in its understanding of mitigating circumstances and their purpose, and the option to recommend a life sentence although aggra-

---

ing, entered upon the indictment, dated and signed by your foreman, and returned into Court for publication.

You may retire and begin your deliberations, after you have received the indictment and documented evidence adduced in the presentence hearing, and then determine the penalty or punishment that shall be imposed in this case. You must first consider and find beyond a reasonable doubt that the aggravating circumstance, or the murder happening while in the perpetration of another capital felony, armed robbery; armed robbery is a capital felony, you must find that beyond a reasonable doubt.

If you find that to exist, then you shall so indicate in writing, then you will determine whether or not you will impose the death penalty, and your verdict then will be one of two: "We the jury recommend the death penalty," or "We the jury do not recommend the death penalty." That is a matter for your determination, ladies and gentlemen.

You will have this in writing to carry out with you to assist you in preparation of your verdict. You may retire at this time and fix punishment in this case.

*Spivey,* 661 F.2d at 468.

vating circumstances are found, violate the eighth and fourteenth amendments.[7]

After the guilty verdict was recorded, but prior to the receipt of any evidence in the sentencing phase, the court explained to the jury what would occur at this stage of the trial. The court stated:

Now, Ladies and Gentlemen, having convicted the defendant of the offenses of murder and armed robbery, it is necessary that the court resume the trial and conduct a presentence hearing before you, the only issue to be the determination of the punishment to be imposed.

Subject to the laws of evidence, you, the Jury, shall hear additional evidence in extenuation, mitigation or aggravation of punishment, including the record of any prior crimes, convictions or pleas of guilty or pleas of nolo contendere of the defendant, or the absence of any such prior crimes convictions and pleas.

You Jurors shall hear arguments by the defendant or his counsel and the prosecuting attorney as provided by law regarding the punishment to be imposed.

At the conclusion of evidence and argument, the court will give you instructions, after which, you will retire to determine the punishment to be imposed. It will be your duty to fix the sentence within the limits prescribed by law and the court will impose the sentence fixed by you in the way and in the manner you prescribe.

The state contends that the district court was correct when it found the instructions, taken as a whole, would lead a reasonable juror to fully understand the duties and options under the charge considering the statement set out above. We disagree. Even if this explanatory statement can be considered part of the capital sentencing charge—which we seriously doubt it can—it still does not meet the requirements specified in *Spivey*. The reference to "evidence in mitigation" in no way told the jury what a mitigating circumstance is, nor explained its function in the jury's deliberation process. *Spivey*, 661 F.2d at 471.

The *Spivey* jury instructions were found lacking because adequate guidance as to the function of mitigating circumstances was not provided. That part of the *Spivey* charge authorizing the jury "to consider all the evidence received by you in open court, and [sic] both phases of the trial . . . [and] all the facts and circumstances of the case" was held not to be the type of clear instruction that the Constitution requires. *Spivey*, 661 F.2d at 472. Goodwin's charge is similarly infected with this insufficient passage. On this ground alone, his death sentence is required to be vacated. The trial court's charge in this case, however, is doubly fatal. Nowhere does the charge even slightly hint about the option to impose life imprisonment even though aggravating circumstances are found.[8] We agree with Justices

---

7. As did the petitioner in *Spivey*, Goodwin challenges the jury instructions given in this case, not the validity of the Georgia death penalty statute. The relevant statute provides in pertinent part that, "the judge shall consider, or he shall include in his instructions to the jury for it to consider, any mitigating circumstances or aggravating circumstances otherwise authorized by law." Ga.Code Ann. § 27–2534.1(b). As noted in *Spivey*, the trial court is not constitutionally required to use the words "mitigating circumstances" in its capital sentencing charge. "So long as the instruction clearly communicates that the law recognizes the existence of circumstances which do not justify or excuse the offense, but which, in fairness or mercy, may be considered as extenuating or reducing the degree of moral culpability . . . the constitutional requirement is satisfied." *Spivey*, 661 F.2d at 471 n.8 (citation omitted).

8. In holding the capital sentencing charge constitutional, the district court noted that the district attorney in his closing argument to the jury during the sentencing phase of the trial stated: "So you are going to determine whether or not Terry Lee Goodwin is to be sentenced for the offense of murder, either to life or death." What this implies, of course, is that even if the trial court's instructions did not make it perfectly clear, the district attorney certainly did. During oral argument before this panel, counsel for the state made a similar evaluation. While not specifically contending that argument of counsel suffices if it informs the jury about the mitigating circumstances, state's counsel reasoned that it's impractical for a trial court trying to ascertain if a jury is aware of the scope of its authorization to totally ignore argument of counsel, especially where counsel relies on diminished capacity, race, and economic background in his closing argument.

Hill and Marshall who, in their dissent to the denial of Goodwin's state habeas corpus petition commented that "the judge did not instruct the jury in any way, even unclearly, about the option to recommend against death as required by *Lockett*." *Goodwin v. Hopper*, 243 Ga. 193, 197–98, 253 S.E.2d 156, 160 (1979) (Hill, J., dissenting).

Because this charge fails to adequately describe the nature and function of mitigating circumstances and lacks any discussion on the option to recommend against death, we hold the charge unconstitutional.[9] Accordingly, Goodwin's sentence of death must be vacated.

## IV. THE EFFECTIVENESS OF GOODWIN'S TRIAL COUNSEL

Goodwin claims that his sixth amendment right to assistance of counsel was denied by the ineffectiveness of his court-appointed trial counsel. To bolster this claim, he raises a plethora of allegations regarding the failings of counsel. Goodwin submits that his court-appointed attorneys (1) failed to interview crucial witnesses; (2) failed to effectively challenge the legality of Goodwin's arrest; (3) failed to challenge grand and petit jury composition; (4) failed to object to *Witherspoon* violations in the exclusion of certain veniremen; (5) failed to request an instruction on mitigation of circumstances at the sentencing phase and failed to object to the trial court's failure to give such an instruction charge as required by Ga.Code Ann. § 27–2534.1(b); (6) failed to object to the admission of the records of

prior convictions introduced during the sentencing phase of his trial where the state had failed to give notice as required by Ga.Code Ann. § 27–2503; (7) failed to request an instruction regarding Goodwin's diminished mental capacity, and (8) failed to object to the victim's family being seated inside the bar of the court. Goodwin suggests that these failings were generated by counsels' overall attitude concerning their representation of an unpopular client.[10]

In response, the state insists that considering the formidable task in representing a defendant accused of brutally stabbing his victim, Goodwin's appointed counsel rendered reasonably effective assistance. The state cites the interviewing of Goodwin, his mother, and various state witnesses, the availability of the district attorney's files, visiting the scene of the crime, attempts to plea bargain, the filing of pre-trial motions to quash the indictment and suppress the confession, and the pursuit of a defensive theory that Goodwin was too mentally incapacitated to give a knowing and voluntary confession as examples of the effectiveness of Goodwin's trial counsel.

We address these contentions in the light of this circuit's legal standard for reviewing ineffective assistance of counsel claims, noting initially that whether a defendant has been denied effective assistance of counsel is a mixed question of fact and law. *Cuyler v. Sullivan*, 446 U.S. 335, 341–42, 100 S.Ct. 1708, 1714, 64 L.Ed.2d 333 (1980); *Washington v. Watkins*, 655 F.2d

Any suggestion that counsel's argument can perfect an otherwise faulty jury charge is totally erroneous. Arguments of counsel can never substitute for the instructions given by the court. *Taylor v. Kentucky*, 436 U.S. 478, 488–89, 98 S.Ct. 1930, 1936, 56 L.Ed.2d 468 (1978).

9. Since ruling on this issue in Goodwin's state habeas corpus petition, the Georgia Supreme Court has apparently taken a different position on the constitutionality of a sentencing charge identical to Goodwin's insofar as the option to recommend against death is unclear. In *Zant v. Gaddis*, 247 Ga. 717, 279 S.E.2d 219 (1981), the court affirmed the granting of habeas corpus relief as to sentence where the charge failed to adequately inform the jury of its op-

tion. "[T]he trial court's charge failed to ... inform the reasonable juror that he could recommend life imprisonment even if he should find the presence of one or more of the statutory aggravating circumstances. Nowhere *in the charge is this option made clear to the jury*." *Zant*, 247 Ga. at 720, 279 S.E.2d at 222 (emphasis added).

10. Counsel originally appointed to defend Goodwin was a relative of the victim. This prompted his disqualification. The Walton County Superior Court then appointed Goodwin's trial counsel and co-counsel who represented him at trial and on appeal to the Georgia Supreme Court.

1346, 1354 (5th Cir. 1981).[11] The clearly erroneous rule does not apply to such questions. *Baker v. Metcalfe,* 633 F.2d 1198, 1201 (5th Cir.), *cert. denied,* 451 U.S. 974, 101 S.Ct. 2055, 68 L.Ed.2d 354 (1981). Consequently, a state habeas corpus court's resolution of this question is not entitled to a presumption of correctness under 28 U.S.C.A. § 2254(d) (1976). *Harris v. Oliver,* 645 F.2d 327, 330 n.3 (5th Cir. 1981). Therefore, we are not bound by the state court's finding that Goodwin's trial counsel rendered effective assistance. We have no real disagreement, however, with the state habeas corpus court's factual findings on historical matters, that is, findings concerning what counsel actually did in preparation for trial. Here, the state habeas corpus court entered such findings after full and fair consideration of the issue in the state habeas corpus proceeding.[12] This eliminated the need for an evidentiary hearing in the district court. *West v. Louisiana,* 478 F.2d 1026, 1031–32 (5th Cir. 1973), *panel opinion aff'd and adhered to in relevant part,* 510 F.2d 363 (5th Cir. 1975) (en banc). As stated in *West:*

> Where state factfinding procedures are adequate, comity and judicial economy dictate that the federal courts should not hold separate evidentiary hearings. To hold a federal hearing is to call state factfinding procedures into question. But comity does not govern the application by federal courts of their independent judgment as to federal law. That is their obligation in all cases. . . .

*West,* 478 F.2d at 1032.

■ As to the historical, or primary factual findings made by the state court, section 2254(d)'s presumption of correctness is appropriate in a federal habeas corpus proceeding. *Mason v. Balcom,* 531 F.2d 717, 722 (5th Cir. 1976). Accordingly, we accept the historical findings made by the state court concerning what Goodwin's trial counsel did to prepare for his trial. This accept-

ance, however, does not limit our examination of the state habeas corpus transcript for its revelations of trial counsel's inactions and the reasons therefor. We apply our own judgment to decide whether the actions taken in preparation and investigation of Goodwin's defense were "so minimal as to constitute ineffective assistance." *Baty v. Balkcom,* 661 F.2d 391, 394 n.7 (5th Cir. 1981).

### A. Standard for Effective Assistance of Counsel

■ The oft-cited constitutional standard by which counsel's assistance is evaluated is well established. The sixth amendment, through the fourteenth, entitles a state criminal defendant the right to counsel reasonably likely to render and rendering reasonably effective assistance. *See, e.g., Baty v. Balkcom,* 661 F.2d 391 (5th Cir. 1981); *Nelson v. Estelle,* 642 F.2d 903 (5th Cir. 1981); *Herring v. Estelle,* 491 F.2d 125 (5th Cir. 1974). Effective assistance does not mean errorless assistance, nor counsel judged ineffective by hindsight. *See, e.g., United States v. Burroughs,* 650 F.2d 595 (5th Cir. 1981); *Clark v. Blackburn,* 619 F.2d 431 (5th Cir. 1980); *Easter v. Estelle,* 609 F.2d 756 (5th Cir. 1980). "Rather, the methodology for applying the standard involves an inquiry into the actual performance of counsel conducting the defense and a determination of whether reasonably effective assistance was rendered based upon the *totality* of circumstances and the entire record." *Nelson,* 642 F.2d at 906 (emphasis in original). *See also, United States v. Gibbs,* 662 F.2d 728 (11th Cir. 1981) (determination must come from entire record rather than specific actions). In applying this standard, no distinction is to be drawn between retained and appointed counsel. *Cuyler v. Sullivan,* 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980).

---

11. In *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir. 1981) (en banc), this court adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

12. We explicitly refrain from any intimation as to the fullness or fairness of the consideration given to other issues raised by Goodwin in his state habeas corpus petition.

Every case involving a constitutional claim of ineffective assistance of counsel turns on the facts and the conduct of those involved. *King v. Beto*, 429 F.2d 221, 222 n.1 (5th Cir. 1970). While counsel's performance need not be errorless, it must "fall within the range of competency generally demanded of attorneys in criminal cases." *Mylar v. State*, 671 F.2d 1299, 1301 (11th Cir. 1982). *See also, Beckham v. Wainwright*, 639 F.2d 262, 267 (5th Cir. 1981). The determination of whether the assistance rendered by counsel is reasonably effective, however, is not to be based solely upon his performance at trial. Consideration of the "totality of circumstances" encompasses the quality of counsel's assistance from time of appointment or retention through appeal. At the heart of effective representation is the independent duty to investigate and prepare. "[C]ounsel have a duty to interview potential witnesses and 'make an independent examination of the facts, circumstances, pleadings, and laws involved.'" *Rummel v. Estelle*, 590 F.2d 103, 104 (5th Cir. 1979), *quoting Von Moltke v. Gillies*, 332 U.S. 708, 721, 68 S.Ct. 316, 322, 92 L.Ed. 309 (1948). Thus, "[a]n attorney does not provide effective assistance if he fails to investigate sources of evidence which may be helpful to the defense." *Davis v. Alabama*, 596 F.2d 1214, 1217 (5th Cir. 1979), *vacated as moot*, 446 U.S. 903, 100 S.Ct. 1827, 64 L.Ed.2d 256 (1980). "[T]he cornerstones of effective assistance of counsel" are the "[i]nformed evaluation of potential defenses to criminal charges and meaningful discussion with one's client of the realities of his case." *Gaines v. Hopper*, 575 F.2d 1147, 1149–50 (5th Cir. 1978).

The assistance rendered may be deemed ineffective although the proceedings were not a farce or a mockery. *Herring*, 491 F.2d 125, 128 (5th Cir. 1974). Nevertheless, federal habeas corpus relief is proper only where a showing of prejudice accompanies the initial and distinct determination of ineffective assistance. This is true even in those cases where counsel's preparation and investigation have been adjudged woefully inadequate. *Washington v. Watkins*, 655 F.2d 1346, 1356. Turning now to the specific contentions, we address them in sequence.

### B. Assistance Rendered by Goodwin's Trial Counsel

#### 1. Counsel's General Attitude

To better understand the reasons for trial counsel's ineffective preparation, investigation and handling of this case, an examination of the testimony presented to the state habeas corpus court and comments made during trial is revealing. The Walton County Superior Court appointed counsel and co-counsel to represent Goodwin. Addressing the jury during opening argument and again in the sentencing phase of trial, both counsel and co-counsel alerted the jury to the fact of their appointed status.[13] Counsel justified the reasons for doing so in his state habeas corpus deposition:

Q. I notice that either you or [co-counsel] in your argument made it clear to the jury that you were appointed.

A: Yes, sure.

Q: Why did you do that?

A: Well, you have to live out here.

Q: I'm not sure I understand, sir.

A: Well, as I say—if you're not a country boy—you live in the community and you get a reputation of representing, I got that around here for a

---

13. In his opening argument, trial counsel stated, "I have been appointed by the court to defend Terry Goodwin." At the close of the state's presentation of documentary evidence in the sentencing phase of trial, co-counsel told the jury:

Well if you decided to impose the death penalty today and you decide to sentence him, Terry Goodwin, to the electric chair, historically speaking, you have got a very likely candidate. He is a little old nigger boy, he would not weigh a hundred and fifty pounds. He has got two court appointed lawyers appointed by this court to represent him to do the very best we can for him. He is poor. He is broke. He is probably mentally retarded. I dare say he has not got an I. Q. of over 70. He is uneducated. Probably just unwanted. This is the kind of people that we have historically put to death here in Georgia.

while, of representing everybody that killed somebody. Well, they don't like you. They don't realize that everybody's entitled to a defense. It's just human nature, I suppose.

■■■■■ The state interprets the references to appointed status as nothing more than a legitimate trial tactic aimed at soliciting sympathy from the jury. This interpretation is difficult to accept in light of the reason given by trial counsel. Goodwin, on the other hand, submits that this type of attitude explains why counsel failed to challenge the composition of the grand and petit juries, neglected to object to *Witherspoon* violations, and failed to object to the use of leading questions by the prosecution. We tend to agree with Goodwin, but our reasoning goes further. Admitted concerns over community ostracism do more than inhibit a lawyer's actions at trial where his performance is visible by fellow citizens. An attitude such as this impairs the vitality of investigation, preparation, and representation that all clients deserve, indigent or otherwise. Fears of negative public reaction to the thought of representing an unpopular defendant surely hamper every facet of counsel's functions. Moreover, reminding a jury that the undertaking is not by choice, but in service to the public, effectively stacks the odds against the accused. Although we deplore the sentiments expressed by Goodwin's trial counsel, we cannot overemphasize that the culpability of counsel is not the issue. Rather, our concern centers on the sixth amendment right of the defendant.

Goodwin asserts that his trial counsel's attitude and concerns over community pressure prevented him from challenging the composition of the grand jury pool and the composition of the petit jury pool. In response to inquiry from Goodwin's present counsel in the state habeas corpus proceeding, trial counsel explained why such a challenge was not considered.

Q: Why didn't you file a challenge to the composition of the grand jury?

A: I didn't think it would be to any avail.

Q: What do you base that opinion on?

A: I suppose its because I'm a native of this part of the country and I just don't think about the thing.

Q: What do you mean? Do you think that the grand jury was properly composed with a sufficient number of blacks and women and so on?

A: At that time?

Q: Yes.

A: I suppose I thought that's what it was, yes.

Q: You suppose you thought it was?

A: Subsequent events have proved that it wasn't.

Q: What led you to believe that it was at that time?

A: Just my knowledge of the people. I didn't give any thought to how many blacks and how many women and that sort of thing.

Q: Have you ever filed a challenge to the composition of the grand jury before, in other cases?

A: No.

Q: Has that ever been done in this county?

A: Not until six months after the Goodwin trial.

Q: That was in a civil case, I believe?

A: Yes.

Q: Why haven't jury challenges been filed before, do you know?

[District attorney]: I object. That's calling for speculation.

THE WITNESS [trial counsel]: I can't answer that, unless its like I said while ago; you live here, you know everybody. And when you know somebody pretty well, you're very glad to get them on jury except in this particular case it didn't work out so well.

Q: Would you have felt any pressure in the community if you had challenged the composition of the jury?

A: Its possible. I mean, that's speculative.

Q: Do you remember we had a conversation earlier in which you stated that

there would be that kind of community pressure if you challenged the jury?

A: I think there would be. But as I said, I don't know. Just like I told you while ago, the school kids were wanting to know why I was taking that Terry Goodwin case. The parents told me about it later on. I mean, that sort of thing goes on in this community, any community in the South.

Q: So the same reason that you wanted people to know that you were appointed in the case would lead you not to challenge the jury?

A: Sure.

In *Jones v. Brooks*, No. 75–52 (M.D.Ga. Mar. 29, 1976), the plaintiff class of black men and women of Walton County brought suit against the jury commissioners claiming underrepresentation on juries in violation of the thirteenth and fourteenth amendments to the United States Constitution. In response to the district court's order to show cause why relief should not be granted, the jury commissioners furnished the court and counsel for plaintiffs copies of new and revised grand jury and traverse jury lists. Because blacks and females were underrepresented on voter registration lists in Walton County, the jury commissioners, utilizing a number of methods aimed at discovering the names of black and female citizens in the county, supplemented the jury lists with the names of black and female citizens not found on the voter registration lists. The ratio of blacks and females on the revised list was more statistically in line with the population breakdown reported in the 1970 census. Advising the district court that they intended to continue using procedures which facilitated proper representation of blacks and females on future jury lists, the plaintiff class acknowledged their satisfaction.

█ The facts established in *Jones v. Brooks* indicate the amount of minority rep-

resentation in the grand and petit jury pools in Walton County at the time Goodwin was indicted and tried. According to the 1970 census report, 27.7% of the Walton County population were black and 52.4% were female. Of the thirty grand jurors summoned in February, 1975, the term in which Goodwin was indicted, twenty were white males (66.7%), two were black males (6.7%), and eight were white females (26.7%). Of the 108 people summoned for criminal jury duty in August, 1975, the month of Goodwin's trial, ninety-eight were white (90.7%), ten were black (9.3%), eighty-three were male (76.85%), and twenty-five were female (23.5%). Thus, the disparity between the female population of Walton County and those on the grand jury list was 25.7%, and 29.25% with respect to the petit jury list. The disparity between the black population of Walton County and those on the grand jury list was 21%, whereas an 18.44% disparity existed with respect to the percentage of blacks on the petit jury list.[14]

In *Castaneda v. Partida*, 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977), the Supreme Court reiterated the requirements for proving discrimination in grand jury selection within the context of an equal protection argument. Drawing support from earlier cases, the Court summarized the process:

> Thus, in order to show that an equal protection violation has occurred in the context of grand jury selection, the defendant must show that the procedure employed resulted in substantial underrepresentation of his race or of the identifiable group to which he belongs. The first step is to establish that the group is one that is a recognizable, distinct class, singled out for different treatment under the laws, as written or as applied.... Next, the degree of underrepresentation must be proved, by comparing the proportion of the group in the total population to the proportion called to serve as grand

---

14. More difficult to discern is the number of blacks on Goodwin's trial jury. Goodwin's trial counsel testified in the state habeas corpus proceeding that he recalled only one black on the jury. Goodwin's co-counsel remembered

one or two blacks being on the jury. The district attorney's recollection placed three blacks on Goodwin's jury. From our examination of the record, we can only be certain that of the twelve jurors, at least nine were white.

jurors, over a significant period of time. . . . Finally, as noted above, a selection procedure that is susceptible of abuse or is not racially neutral supports that presumption of discrimination raised by the statistical showing. . . . Once the defendant has shown substantial underrepresentation of his group, he has made out a prima facie case of discriminatory purpose, and the burden then shifts to the State to rebut that case.

*Castaneda*, 430 U.S. at 494–95, 97 S.Ct. at 1280 (citations omitted). The record, through the statistics adduced in *Jones v. Brooks* and those prepared by Goodwin in connection with his habeas corpus petition in state court, indicates that a prima facie case of discrimination in grand jury selection, violative of the equal protection clause of the fourteenth amendment, could have been established, and in the absence of a showing of no discriminatory intent by the state, relief would have been granted. It is undisputed that women and blacks are a recognizable, distinct class under the first element of the prima facie test. *United States v. Perez-Hernandez*, 672 F.2d 1380, 1387 (11th Cir. 1982). Moreover, the statistics disclose racial and gender disparities existing in Walton County juries over a significant period of time, and therefore satisfy the second criteria of disproportionate representation.[15] The Supreme Court has never fashioned precise guidelines for gauging disparate representation. *See Alexander v. Louisiana*, 405 U.S. 625, 630, 92 S.Ct. 1221, 1225, 31 L.Ed.2d 536 (1972).

Nevertheless, Supreme Court and former Fifth Circuit precedent provide some guidance as to the magnitude of disparity needed to establish a prima facie underrepresentation claim. The variance here is sufficiently disproportionate to fall within the approximate boundaries delineated in those cases holding that statistical disparities establish prima facie violations. *See, e.g., Hernandez v. Texas*, 347 U.S. 745, 74 S.Ct. 667, 98 L.Ed. 866 (1954) (14%); *Preston v. Mandeville*, 428 F.2d 1392 (5th Cir. 1970) (13.3%). Finally, as the outcome of *Jones v. Brooks* indicates, the selection procedure utilized by Walton County officials prior to, and at the time of Goodwin's trial was susceptible to abuse. The county officials, in effect, conceded the racial inequalities in their system and took action to correct the imbalance.

To excuse Goodwin's failure to timely challenge the composition of the grand and petit jury pools at this late day, the cause and prejudice requirements of *Francis v. Henderson*, 425 U.S. 536, 96 S.Ct. 1708, 48 L.Ed.2d 149 (1976), must be satisfied. The state maintains that Goodwin has demonstrated neither the cause of, nor the prejudice resulting from this inaction. In *Francis*, the Supreme Court held that where a state prisoner fails to make a timely challenge to the composition of the grand jury that indicted him and his right to do so has been waived under state law, he can collaterally attack the unconstitutional composition in federal court only if he can show

---

**15.** According to Goodwin's statistics, of the potential jurors in the 1971 Walton County petit jury pool, 1,219 or 74.47% were white, 153 or 9.4% were black, and 265 or 16.2% were unidentified. Of this number, 1,349 or 78.8% were male, and 362 or 21.2% were female. With the unidentified persons as to race not distributed, the disparity for black representation on the 1971 petit jury pool was 66%. When the 265 unidentified persons are distributed according to race based on the census ratio for the county, the disparity for black representation was 49%. The disparity for female representation in the 1971 petit jury pool was 31.4%.

The same classifications for the potential jurors in the 1973 Walton County petit jury pool indicate that of the 1,090 summoned, 808 or 74.2% were white, 189 or 17.3% were black and ninety-three or 8.5% were unidentified. Of this amount, 568 or 52.1% were male and 522 or 47.9% were female. The disparity for black representation in 1973 was 10.4%, with the unidentified persons as to race not distributed. The disparity for black representation was 7.7% when the unidentified are distributed according to race based on the 1970 census ratio for Walton County. The female disparity for this time period was 4.5%. In *Jones v. Brooks*, the district court's order establishes that of the 407 potential jurors summoned over the period beginning August, 1974, through August, 1975, 358 or 87.96% were white, forty-nine or 12.04% were black, 301 or 73.96% were male, and 106 or 26.04% were female.

both cause for failing to make the challenge and actual prejudice resulting therefrom. 425 U.S. at 542, 96 S.Ct. at 1711. Applying the state law in effect at the time of Goodwin's trial as directed by the *Francis* Court, failure to raise any objection to the composition of the grand or petit jury at or before trial constitutes a waiver of the right to challenge the composition of those juries.[16] Because Goodwin waived his right to challenge the composition of the grand and petit juries under state law, normal procedure would require us to determine whether he has demonstrated both cause and actual prejudice. Goodwin, however, argues that the state's reliance upon *Francis v. Henderson* is misplaced and explains that his argu-

ment attacking the alleged unconstitutional composition of the juries was not raised as a substantive issue. Rather, Goodwin stresses that the argument is an element asserted for the purpose of bolstering his claim of ineffective assistance of counsel.

▮ Accordingly, Goodwin does not assert the merits of this argument in an attempt to seek relief thereunder.[17] Moreover, the State of Georgia has never had the opportunity to rebut Goodwin's apparently prima facie case. For these reasons, we refuse to grant substantive relief on this claim. We address the merits, however, within the framework of Goodwin's sixth amendment allegation as representing an example of trial counsel's ineffective assist-

16. Ga.Code Ann. § 50–127(1) was amended by 1975 Ga.Laws 1143 and became effective April 24, 1975, approximately four months before Goodwin's trial. The section reads in pertinent part:

> The right to object to the composition of the grand or traverse jury will be deemed waived under this Section, unless the person challenging the sentence shows in the petition and satisfies the court that cause exists for his being allowed to pursue the objection after the conviction and sentence has otherwise become final.

Prior to amendment, confusion existed as to whether the right to challenge grand and petit jury composition in a collateral proceeding was available, given the petitioner's failure to do so before trial. See *Stewart v. Ricketts*, 451 F.Supp. 911 (M.D.Ga.1978).

17. Because of this position, Goodwin has made no effort to demonstrate cause and prejudice as mandated by *Francis v. Henderson*. Nevertheless, a plausible argument can be asserted that, in fact, both the cause of the waiver and the prejudice resulting therefrom exist in the instant case. The cause for the failure to make the timely challenge is evidenced by the testimony of trial counsel adduced in the state habeas corpus proceeding. Trial counsel filed no objection to the composition of the grand and petit jury lists because he was a "native" of that part of the country, and just "didn't think about the thing." Moreover, the reason for making known his appointed status—concerns over his reputation—was again cited as a reason for not challenging the jury. This is not the kind of hollow claim alleged in *Lumpkin v. Ricketts*, 551 F.2d 680 (5th Cir. 1977). Faced with a bare allegation of ineffective assistance of counsel as the cause for failure to challenge a grand jury's composition, the Lumpkin court refused to sanction such a meager contention as demonstrating a legitimate cause. 551 F.2d

at 682–83. The argument in Goodwin's case, however, draws its support from the testimony of the individual whose duty it was to investigate the propriety of such a challenge. As for the waiver's prejudicial effects, the statistics reveal that a prima facie case of discriminatory purpose in the grand jury selection process could have been established. Goodwin would not necessarily have prevailed in such a case, but enough evidence could have been produced in order to shift the burden to the state.

In *Lumpkin v. Ricketts*, the petitioner assigned error to the district court's determination finding a waiver of the right under state law to contest the constitutionality of the composition of the grand jury that indicted him. Primarily concerned with the allegation that the right had not been waived under state law, the former Fifth Circuit relied on Georgia case law existing at the time of the petitioner's trial to hold that a failure to challenge the grand jury array before trial resulted in a waiver. See, e.g., *Dennis v. Hopper*, 548 F.2d 589 (5th Cir. 1977); *Blevins v. State*, 220 Ga. 720, 141 S.E.2d 426 (1965). Thus, the court next addressed the question of whether cause and prejudice had been demonstrated. The petitioner contended that his indictment was the product of a venire that suffered from the same defect disapproved by the Supreme Court in *Whitus v. Georgia*, 385 U.S. 545, 87 S.Ct. 643, 17 L.Ed.2d 599 (1967). The court rejected this contention and noted that prior to trial, counsel for both parties had agreed on the identity of the grand jury pool. 551 F.2d at 682 n.3. As alluded to above, petitioner claimed sufficient cause for the failure was present in his trial counsel's ineffective representation. The facts disclosing the existence of cause and prejudice in the instant case undeniably form a more legitimate basis for examining the jury discrimination issue than those advanced in *Lumpkin*.

ance. Combined with trial counsel's other failings discussed herein, his reasons for not challenging the composition of the grand and petit juries reveal the assistance he was "reasonably likely" to render. We disagree with the state's interpretation of trial counsel's testimony as indicating "a conscientious and studied decision not to file a jury challenge." On the contrary, we view trial counsel assertions as indicating a divided allegiance. These assertions exhibit the lack of vitality attributed to Goodwin's defense and strongly suggest the location of his loyalties. Our adversarial system of justice will be quickly eroded if attitudes such as the one evinced by Goodwin's trial counsel are allowed to dictate when action on behalf of an accused is to be undertaken.

### 2. The Failure to Interview Crucial Witnesses

In this capital murder case, Goodwin's trial counsel failed to interview at least five prosecution witnesses who testified at trial. Among the five were the deputy who took Goodwin from his home in the early morning hours, the victim's sister, and three other witnesses, all of whom entered incriminating statements against Goodwin. Deputy Nathaniel Rakestraw testified at trial that he met with another deputy, Livingston O'Kelly, the evening before Goodwin was taken to the station house. Rakestraw explained why he went to Goodwin's house:

Q: All right. Where were you when you got that information?

A: I was at the shopping center. I met Deputy O'Kelly out there at the shopping center.

Q: All right. And what information did he give you concerning the defendant?

A: He told me that a lady had told him that she was walking past a bunch of boys in a group talking and Terry Goodwin was one of them. And she heard him make the statement he had killed a man and left him down near Social Circle.

Acting on this information, Rakestraw then went to Goodwin's residence and brought him in for questioning.

In the state habeas corpus proceeding, trial counsel stated that these deputies were never interviewed because the files containing their statements were made available to him by the sheriff of Walton County and by the prosecution. Hence, he saw no need to challenge them. Deputy O'Kelly was not called upon to testify at trial. Counsel confirmed this in response to questioning by Goodwin's state habeas corpus counsel.

Q: Okay. Do you remember whether or not you talked to an Officer O'Kelly?

A: I don't believe I interviewed him, no. I know O'Kelly very well. He's deputy sheriff. If I remember correctly, that may be the one that Goodwin was supposed to—some woman told O'Kelly that Goodwin had said that he committed this crime.

. . . . .

Q: But you did not talk to Officer Rakestraw?

A: I don't recall it.

Q: Okay. Did you talk to office O'Kelly? You may have already answered this. Did you talk to O'Kelly about this case?

A: I don't remember.

Q: Do you think that you probably did?

A: I talked to him yeah. I didn't have any formal interview that I can remember.

. . . . .

Q: Okay. How did you find out that Officer O'Kelly had talked to a woman about it?

A: One of the deputies told me.

Q: Who was that that told you?

A: I don't remember that.

Q: Did you find out the name of the woman that had told Officer O'Kelly?

A: I never did learn that.

Ed Mitchell, a listed potential prosecution witness who testified at trial, was not interviewed. While visiting Mitchell at his home some two weeks before the killing, Mitchell claimed that Goodwin, without provocation or apparent reason, impetuously remarked,

"I oughta kill somebody and take their car." Mitchell testified that he considered Goodwin to be kidding, and did not pay much attention to the statement. As for Mitchell's testimony, trial counsel thought it unnecessary to challenge its veracity. He explains:

Q: Let's get over to some of those other witnesses that testified. One of the black boys you talked about, I believe, was Ed Mitchell?

A: Yeah, he testified at trial.

Q: Were you able to talk to him prior to trial?

A: No.

Q: Was he on the list of witnesses that you were given from the state as a potential prosecution witness?

A: I think he was.

Q: Okay. Now, he made a rather, if I remember, a rather damaging statement at trial. I believe that it was to the effect that he—

A: Told him he was going—

Q: Terry had told him that he was going to kill and rob some boy that operated the pool hall. When did you first find out that Mitchell was going to testify to that?

A: I think I read his statement in the police files, in the deputy sheriff's files.

. . . . .

Q: Okay. In Mitchell's written statement that you saw—I believe you said that this was part of the statement the DA turned over to you, you were able to see?

A: They made it available to me. I didn't take copies of it, but I read them.

Q: In that statement, did Mitchell say that Terry had said what he testified to at trial?

A: Yes.

Q: Why didn't you go out and talk to Mitchell about that statement prior to trial?

A: I didn't think it was necessary.

Q: Do you think that Mitchell had any ulterior motive in testifying to the police?

[District attorney]: Object to that. I think its's just speculation.

THE WITNESS: I couldn't say. I never believed any of them, any of those colored boys, because it seemed like, appeared at the time, that they were doing that to help themselves with the sheriff.

Trial counsel also did not interview Benny Cooper, a listed potential prosecution witness whose testimony placed Goodwin at the scene of the crime the afternoon after the killing. Cooper explained that while traveling on his employer's bus, the driver stopped to pick up a hitchhiker near the dirt road where the victim's body was later discovered. At the courthouse the following day, Cooper told Sheriff Franklin Thornton that his bus had picked up a hitchhiker along the side of the particular road. Thornton then showed Cooper a photograph of Goodwin and asked Cooper if this was the hitchhiker. Cooper answered affirmatively. He also made an in-court identification of Goodwin as the hitchhiker. Regarding Cooper's testimony and his damaging identifications, trial counsel again thought it unnecessary to raise any doubts:

Q: Did you interview Benny Cooper?

A: No.

Q: My recollection of the transcript is that Mr. Cooper, when he was there in the police station, said that he'd seen a man out on the road, and the sheriff handed him a picture and said, 'Is this the man that you saw?' Did you consider filing a motion to challenge the procedure that that identification was made by?

A: No.

Q: Why not?

A: I didn't think it was necessary.

Q: Did you think it would lose?

A: Huh?

Q: Did you think it wouldn't be a successful motion?

A: Well, I didn't think that the testimony, as he gave it was important enough to make any objections to it.

Q: [The prosecuting attorney] thought it was important enough to use in the trial, use in his closing argument?

A: Yeah, that's right. Course, I'll tell you how I am about things like that. Unless I think they'll accomplish something, I don't make an objection. Course I know as far as you fellows are concerned, that's very important but the only thing that I seriously tried to get thrown out was the confession, which, if I have been successful in that, they'd have never had a conviction. The evidence they gathered from that confession—

Trial counsel indicated in his state habeas corpus deposition that, in his opinion, Mitchell and Cooper were "snitches," informants for the sheriff's department in return for leniency in other crimes or investigations. His opinion was based upon what deputies had told him. He characterized the witnesses as unreliable, capable of fabricating a story to remain in good standing with the law. No effort, however, was made to question their versions.

Q: Do you share my feelings that those little tidbits seem to be a little bit too pat? And, if so, what did you do to find out whether or not they were fabricated or placed in someone's ear?

A: Well, actually, I didn't know definitely before we went to trial what they were going to testify to. I knew the association, and I knew of no way to counteract that.

 . . . . .

Q: Do you think that these were crucial? Do you think that these statements were, in your opinion, were crucial in terms of the conviction for robbery?

A: No, no. I still don't think he robbed him. And I don't think they proved it.

Q: But you don't think that the statements that he was going to rob somebody were crucial in the conviction of the robbery?

A: No, I don't. I think it was just bragging to his buddies, is what I thought at that time; still believe it.

Q: But you made no effort personally to contact any of these people?

A: No.

## 3. Failure to Effectively Challenge the Events through which Goodwin was Brought into Custody

Upon receiving the information from deputy O'Kelly, deputy Rakestraw, accompanied by deputy Wiggams, went to Goodwin's home. When he arrived sometime after midnight, Goodwin's mother answered the door and let Rakestraw in. On cross-examination at trial, Rakestraw explained the situation this way:

Q: Okay. Now when you knocked on the door, did you tell Mrs. Goodwin what you wanted?

A: She first asked who it was, and I told her the deputy sheriff.

Q: When she opened the door?

A: Right.

Q: You went in. Where was Terry?

A: He was in the back bedroom, in bed.

Q: Was he undressed?

A: Yes, sir.

Q: Did you tell him to get up and get dressed?

A: I told him . . . .

Q: What did you tell him? Just tell me what you told him.

A: I told Terry I wanted to talk to him down to the office, to get up and get his clothes on.

Q: And he did not ask you what you wanted to talk with him about?

A: No, sir.

Q: You did not have a warrant?

A: No, sir.

Q: Is it customary to go out to people's houses without a warrant or without seeing some crime committed and go in?

A: Well I was invited in.

Q: You were invited in?

A: Plus, I wasn't suspect of anything.

Rakestraw claims that he did not arrest or intend to arrest Goodwin at that time, rath-

er, he was a suspect in the case and he accompanied him willingly to the sheriff's office. Goodwin was taken to another deputy who advised him of his rights. Although Goodwin was subsequently transferred to different offices, he remained in the custody of sheriff's deputies until his confession was obtained on Saturday evening.

Goodwin now contends that Rakestraw's statement was not merely a request to accompany the deputy for questioning. To the contrary, Goodwin asserts that at the moment deputy Rakestraw told him "to get up and get your clothes on" he was under arrest, and, because probable cause did not exist to support it, the arrest was illegal. Goodwin further claims that the state has the burden of proving voluntary consent and the testimony of the seizing officer in no way satisfies this burden.

According to Goodwin's trial counsel, the defensive strategy was two-pronged: The first objective was to suppress the confession and failing that, to obtain a life sentence. Attempts to bargain for a plea were halted when trial counsel learned that the district attorney was steadfastly seeking the death penalty. On the day of trial, trial counsel attacked Goodwin's confession by filing a broadly worded motion to suppress. The motion was framed in a manner so as to challenge deputy Rakestraw's actions as constituting an illegal arrest. The motion states: "On the 12th day of April, 1975, at about 2:00 a. m., defendant was rousted from his bed at home and arrested by deputies Rakestraw and Palmer without warrant and carried to the Walton County Sheriff's Office." In his argument in support of the motion to suppress, trial counsel never proceeded with the theory that the circumstances amounted to an illegal arrest and in denying the motion, the trial court made no specific finding as to whether Goodwin was illegally arrested or as to the existence of probable cause. Similarly, on appeal to the Georgia Supreme Court, Goodwin's trial counsel did not enumerate as error the admission of the confession because of an illegal arrest, rather, he asserted that Goodwin's mental capacity effectively prevented him from knowingly

waiving his rights. Goodwin asserts a number of reasons why no challenge to the deputies' actions was taken, all of which are supported by the record. Because trial counsel never interviewed deputy Rakestraw, the deputy who took Goodwin to the sheriff's office, trial counsel never learned how the deputies obtained sufficient information to arrest him nor did he find out the name of the person who allegedly told deputy O'Kelly the contents of the conversation she had overheard. Moreover, trial counsel was unaware that under the parameters of the poisonous tree doctrine, an illegal arrest may affect the admissibility of a subsequent confession. Trial counsel's response to questioning regarding this issue in the state habeas corpus proceeding is enlightening:

Q: Okay. Do you, thinking back on the case and what you knew about it, do you think that the arrest was a legal arrest?

A: No, I—

[District attorney]: Object.

THE WITNESS: I don't really believe that.

Q: What do you base that opinion on?

A: Well, to get the warrant in the first place, they had to have a reasonable ground to believe that he was involved in it. And I never did think that they had that. I never had found out how they, except for the so called statement by O'Kelly and the other officer that this woman—

Q: Rakestraw?

A: Rakestraw, yeah. I never did know how they really got out there to get into his house and pick him up.

Q: You never found out how they got enough information to go out and arrest him in the first place?

A: Yeah, that's right.

Q: Now, what you're talking about is when they went out, I believe it was like twelve-thirty in the morning on the 12th.

A: That's right.

Q: Explain that a little bit. What do you mean, you never found out?

A: Well, they kept talking about the telephone calls—

Q: Right.

A: —and tracing them out to him. They never, at any time did they ever identify, positively identify, that it was Goodwin.

Q: That it was Terry?

A: But they must of had some information, because he admitted it.

Q: What efforts did you make to try to get that information?

A: No more than asking the deputies and the officers how they happened to go out there.

. . . . .

Q: Are you familiar with the *Wong Sun* case?

A: The what?

Q: *Wong Sun v. United States.*

A: No.

Q: Never heard of that case?

A: No, I haven't.

Q: Are you familiar with the doctrine of the Fruit of the Poisonous Tree?

A: Yes, I know that. In fact, [defense co-counsel] in his, I believe in arguing before the jury, he brought that out. I've got a bad memory in late years.

Q: You said before that you thought that the arrest was illegal?

A: Yes.

Q: Do you think, in your professional opinion, under the doctrine of poisonous tree, that might have had an effect on the admissibility of the confession?

A: No sir.

Q: I'm sorry?

A: No sir.

In *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), the Supreme Court, expounding on the contours of the exclusionary rule, declared that the rule not only prohibited from use at trial tangi-ble evidence obtained as a direct result of an unlawful invasion, but barred the use of verbal statements by the accused as well. 317 U.S. at 485, 83 S.Ct. at 416. "Thus, verbal evidence which derives so immediately from an unlawful entry and an unauthorized arrest ... is no less the 'fruit' of official illegality than the more common tangible fruits of the unwarranted intrusion." 317 U.S. at 485–86, 83 S.Ct. 416 (footnote omitted). According to Goodwin, this lack of understanding of the legal principles set out in *Wong Sun* most likely explains trial counsel's inaction.[18]

### 4. *Other Failings by Trial Counsel*

Goodwin enumerates other instances where he claims trial counsel's actions or inactions fell below the requisite standard. He cites as ineffective assistance his counsel's failure to object at trial and on motion for new trial and on appeal the improper exclusion of veniremen in violation of *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). During voir dire, the veniremen were asked collectively if they conscientiously opposed capital punishment, and, if so, to stand up. Four veniremen stood up. The district attorney then asked these four, "Are your reservations about capital punishment such that you could not vote truly and fairly and impartially on the issue of whether or not a person charged is guilty or not guilty of the crime charged? If so, raise your hand." Mr. Hayes responded, "Well I could not vote." The district attorney then stated, "Could not vote at all? Your honor, it appears that Mr. Hayes and Ms. Malcom are disqualified." The trial court agreed and directed Hayes and Malcom to take a seat in the courtroom. When Goodwin's trial counsel asked permission to ask questions of Hayes and Malcom, the trial court informed counsel they had been disqualified. Trial counsel then asked, "Did they say they were unalterably opposed to capital punish-

18. In his argument to the trial court on Goodwin's motion to suppress evidence obtained from the search warrant, co-counsel stated "that under the rules of the fruit of the poison tree doctrine, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441, all testimony concerning these ar-ticles is, as well as the articles themselves, should be scratched." Obviously, co-counsel was aware of the Wong Sun decision; he did not understand, however, its reasoning and proper application regarding the suppression of evidence obtained via an illegal arrest.

ment?" The trial court replied affirmatively. Notably absent, however, is any statement from the mouth of Ms. Malcom regarding her reservations about capital punishment. She was never asked to explain her position.

██ The Supreme Court's mandate in *Witherspoon* is well known. It teaches that "[u]nless a venireman *states* unambiguously that he would automatically vote against the imposition of capital punishment no matter what the trial might reveal, it simply cannot be assumed that that is his position." 391 U.S. at 515 n.9, 88 S.Ct. at 1773 n.9 (emphasis added). The state may validly implement the sentence of death only where the

> jury from which the only veniremen who were in fact excluded for cause were those who made unmistakably clear (1) that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's *guilt.*

391 U.S. at 522 n.21, 88 S.Ct. at 1771 n.21 (emphasis in original). A raising of the hand fails to satisfy *Witherspoon*'s calling for an unambiguous statement on the question of whether a venireman "would automatically vote against the imposition of capital punishment no matter what the trial might reveal ...." 391 U.S. at 516 n.9. The law in this circuit demands strict adherence to *Witherspoon*'s requirements. *See, e.g., Granviel v. Estelle,* 655 F.2d 673 (5th Cir. 1981); *Burns v. Estelle,* 626 F.2d 396 (5th Cir. 1980) (en banc).

In its consideration of this issue, the district court, 501 F.Supp. 317, adopted the proposed finding of the magistrate which concluded that Malcom had made it unmistakably clear that her attitude toward the death penalty would have prevented her from making an impartial decision as to Goodwin's guilt or innocence. Trial counsel offered the following explanation at the state habeas corpus hearing as to why no objection to Malcom's removal was filed:

Q: Now, as a result of those proceedings there were, I believe, four jurors disqualified.

A: Disqualifed, I think so. Three men and a woman.

Q: Alright. And you did not object to their disqualification. I want to know why.

A: Because they said they were unalterably opposed.

Q: Okay.

A: According to my question.

Q: Did you object to the judge's not allowing you to question them to rehabilitate them?

A: No, not after they made the statement.

Q: But you wanted to ask them a few questions to rehabilitate them?

A: I didn't understand what they said, was the reason I was asking them.

Q: I see. Is it your legal opinion that you could or could not, that you should or should not, have an ability to rehabilitate the jurors?

A: Not after they made the statement.

Q: It's your legal opinion that you have no right to rehabilitate the jurors?

A: [District attorney]: I object to that.

THE WITNESS: I don't think so, no sir.

Q: Some of these people didn't make a statement at all, they just raised their hand or stood up.

. . . . .

A: The only one I remember on my reading that, was the woman that didn't answer the question.

Q: What about her?

A: I don't know about her. At that time if she didn't, I didn't catch it. But after reading what you read there while ago, it seemed that she didn't make any statement.

Q: Did you want to question her?

A: No, not after the judge said what he did.

Q: You thought that barred you from asking any questions?

A: No, it didn't bar me, but I didn't see any necessity. If they'd made the statement that they were unalterably opposed to it and there wasn't any changing their minds, why, I didn't see what I'd accomplish by going on and doing it further.

A raising of the hand may or may not satisfy *Witherspoon*'s calling for an unambiguous statement on the question of whether a venireman "would automatically vote against the imposition of capital punishment no matter what the trial might reveal . . . ." 391 U.S. at 516 n. 9, 88 S.Ct. at 1774 n. 9. Depending upon the comprehensiveness of the questions addressed to a potential juror, it may be possible in some instances for a court to decide that a response other than verbal is unquestionably unambiguous. We leave that question for another case, however, because our concern focuses on trial counsel's ignorance of the right to question a venireman, particularly where the venireman has stated nothing. Trial counsel simply failed to notice that Malcom never stated her unalterable opposition to the death penalty. Had he realized this, he could have questioned her further without depending upon the trial court's erroneous conclusion that Malcom had said she was unalterably opposed to the death penalty. Thus, because of what we can determine only to be inattention, trial counsel permitted a potential juror to go unquestioned about her exact position regarding capital punishment, an area of inquiry that he obviously desired to pursue.[18a]

Among the other instances where Goodwin contends counsel was ineffective during his trial, he cites his trial counsel's failure to object to the victim's family being allowed to sit inside the bar of the court. Trial counsel explains why no objection was raised.

Q: Can you tell us where the Studdard family sat during the trial?

A: Inside the rail, right back of defense counsel's table.

A: Approximately how far is that from the jury?

. . . . .

A: It would be twenty; twenty or twenty-five feet. Maybe not that much. Well, you know where the jury was.

. . . . .

Q: Did you object to that procedure?

A: No, I didn't object to it.

Q: Why not?

A: I didn't think it was important.

Trial counsel failed to object to the trial court's failure to charge the jury on mitigating circumstances as required by Ga. Code Ann. § 27–2534.1(b). *See* footnote 6. Moreover, trial counsel failed to request a charge on Goodwin's diminished capacity, the focal point of the entire defense. No explanation was given why such a request was not tendered to the trial court. Trial counsel also failed to object to the admission of Goodwin's prior conviction records for forgery which were introduced during the penalty phase of the trial. By statute in Georgia, evidence of prior criminal convictions are admissible in the penalty phase provided the state has informed the defendant of its intention to use such evidence. Ga.Code Ann. § 27–2503(a), (b). For purposes of the motion to suppress the confession hearing only, the district attorney introduced records of Goodwin's 1974 forgery convictions in an attempt to demonstrate Goodwin's ability to knowingly and intelligently waive his rights as he had allegedly done in conjunction with the 1974 convictions. Goodwin's trial counsel did not object to their introduction. The records were labeled state's exhibits number twenty-nine and thirty. Later, in the sentencing phase, the district attorney tendered into evidence for the purposes of the trial the conviction records. Defense counsel did not object. The record is devoid of any document giving notice of the intention to introduce the prior conviction records at the presentenc-

18a. When questioned if he had noticed the Malcom omission upon review of the trial transcript in preparation of the motion for a new trial and direct appeal, trial counsel stated that his co-counsel reviewed the transcript for Witherspoon violations. Co-counsel testified that he did not review the transcript for Witherspoon violations.

ing hearing. The record does reflect, however, that in the forgery convictions, Goodwin was represented by one of the two attorneys appointed to represent him in the murder trial in question. Obviously then, his trial counsel was well aware of the prior convictions. Awareness, however, is not tantamount to knowledge of the state's intended reliance upon those convictions as evidence in aggravation. *See Gates v. State*, 229 Ga. 796, 194 S.E.2d 412 (1972).

Trial counsel failed to object on more than one occasion to the prosecution's use of leading questions. A conspicuous example: "Do you recall having any conversation with Terry Goodwin concerning a robbery or murder prior to the time this man [the victim] got [sic] missing?" The witness asked the prosecutor to repeat the question, which he did. The witness answered affirmatively. Queried if he thought this was a fairly leading question, trial counsel thought so but did not object because, in his opinion, the witness was of low intelligence. No evidence was ever presented as to the intelligence of this witness nor did defense counsel use cross-examination to reveal that the witness's intelligence was other than normal.

### D. *Goodwin's Trial Counsel Rendered Ineffective Assistance*

 Adopting the recommendation of the magistrate, the district court concluded that Goodwin's two trial attorneys provided reasonably effective assistance of counsel throughout all phases of his trial. We disagree. Assessing the effectiveness of trial counsel by the standards set forth herein, we hold that trial counsel fell below that level of effectiveness mandated by the interpretation of the sixth amendment right. Our examination of the areas in which Goodwin contends his counsel provided ineffective assistance compels us to conclude that this counsel was not reasonably likely to render, and did not render, reasonably effective assistance. *MacKenna v. Ellis*, 280 F.2d 592, 599 (5th Cir. 1960), *adhered to in pertinent part on rehearing en banc*, 289 F.2d 928 (5th Cir.), *cert. denied*, 368 U.S. 877, 82 S.Ct. 121, 7 L.Ed.2d 78 (1961). In

the totality of circumstances of this case, counsel's lack of investigation and general attitude, when taken together, deprived Goodwin of the zealous representation due any client, even those accused of committing atrocious acts. Trial counsel neglected an examination of the grand and petit jury selection procedures in Walton County at the time in question. Such an examination would have revealed glaring disparities in racial and gender representation. Additionally, trial counsel failed to make an informed evaluation of a potential defense, namely, that Goodwin was illegally arrested. *See Gaines v. Hopper*, 575 F.2d at 1149–50 (habeas corpus relief proper where failure to investigate deprived petitioner of defense otherwise assertable). By his own admission, trial counsel's lack of investigation into the circumstances surrounding the taking of Goodwin from his bedroom prevented an evaluation as to the existence of probable cause. On behalf of Goodwin's defense, we glean from the record that trial counsel interviewed Goodwin at least five times prior to trial. Co-counsel visited the scene of the crime on two occasions. Attempts to plea bargain with the district attorney proved unsuccessful. Pre-trial motions to quash the indictment and suppress the confession and evidence obtained from the search of Goodwin's home were filed. At one point, trial counsel considered filing a motion requesting a change of venue but ultimately decided otherwise. Counsel filed a timely motion for new trial and, upon its denial, argued Goodwin's appeal in the Georgia Supreme Court. When counsel's performance is placed in the balance of the entire record, however, we can only conclude that his failures were grossly disproportionate to the positive aspects of his representation and in our view amounted to ineffective assistance.

 Finding the assistance rendered by Goodwin's trial counsel constitutionally inadequate does not complete the inquiry. As *Washington v. Watkins* emphasizes, "[t]he law of [the former Fifth Circuit] is as yet unclear as to the precise *degree* of prejudice that a defendant must demonstrate before he is entitled to habeas corpus relief

on grounds that he received ineffective assistance of counsel, although it is clear that *some* degree of prejudice must be shown." 655 F.2d at 1364 (footnote omitted, emphasis in original).[19] Goodwin maintains that a sufficient degree of prejudice flows from the existence of both a meritorious grand jury discrimination claim and a viable defense that went unheeded due to the lack of investigation. Had counsel investigated, Goodwin claims, he would have discovered that at the time Goodwin was considered under arrest, no probable cause existed to effectuate the seizure. The record appears to bear Goodwin out. Sheriff Franklin Thornton was asked during cross-examination if he knew personally or if his records indicated when Goodwin was placed under arrest. He testified that when the deputies brought him from his home to the sheriff's office after midnight and detained him in the jail, Goodwin was counted as arrested. As noted previously, it is Goodwin's contention that he was under arrest for fourth amendment purposes the moment deputy Rakestraw told him to get up and get dressed.[20] Rakestraw's decision to pick up Goodwin was precipitated by deputy O'Kelly's information concerning assertions by an unidentified girl claiming to have overheard Goodwin make incriminating statements. Without anything more, this is not enough to establish probable cause to arrest. Probable cause to arrest "exists where 'the facts and circumstances within [the arresting officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed." *Draper v. United States*, 358 U.S. 307, 313, 79 S.Ct. 329, 333, 3 L.Ed.2d 327 (1964), *quoting Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925). Where the information leading to the formulation of an officer's reasonable belief is supplied by an informant, the adequacy of such information must be tested by the two-prong analysis of *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964) and *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). *Quoting Aguilar v. Texas*, 378 U.S. at 114, 84 S.Ct. at 1514, the former Fifth Circuit stated:

> To rely on an informant's report to establish probable cause, it must first affirmatively appear that the agents were informed of:
>
> [first] some of the underlying circumstances from which the informant con-

**19.** See *Washington v. Watkins*, 655 F.2d at 1362 n.32 and cases cited therein. The obscurity surrounding the prejudice aspect of ineffective assistance claims should soon be clarified by this court sitting en banc. We note that the issue of the degree of prejudice which must be demonstrated in an ineffective assistance of counsel case is involved in the case of *Washington v. Strickland*, 673 F.2d 879 (5th Cir. 1982) (Unit B) which was orally argued before the en banc court on June 15, 1982. We need not await the decision of the en banc court, however, because we conclude in the instant case that the prejudice is so obvious that a sufficient degree of prejudice exists under any standard that the en banc court might adopt.

**20.** Goodwin contends that the circumstances in this case are indistinguishable from those found in *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979). In *Dunaway*, the Supreme Court was confronted with a situation where police officers acting on less than probable cause located a suspect at a neighbor's house. The officers then took the suspect into custody and although he was never told he was under arrest, he would have been restrained had he sought to leave. While in custody and after *Miranda* warnings, the suspect made incriminating statements linking himself to the crime. The Court held that whether or not the seizure was technically characterized as an arrest, it was so indistinguishable from a traditional arrest that it must be supported by probable cause. 422 U.S. at 216, 99 S.Ct. at 2258. Additionally, the Court concluded that the connection between the illegal police activity and the incriminating statements was not sufficiently attenuated so as to permit their use at trial. 422 U.S. at 219, 99 S.Ct. at 2260.

Regarding Goodwin's factual argument, he maintains, although he has never testified as to its truth, that a dispute exists as to whether he accompanied the deputies willingly. While the event as testified to by deputy Rakestraw unquestionably lends itself to such an inquiry, the inadequacy of the record prevents us from addressing this contention. No deputy has testified whether Goodwin would have been free to remain in bed despite the statements made to him by deputy Rakestraw. Accordingly, we refrain from reaching the merits of this factual claim.

cluded that his information was accurate, and [second] some of the underlying circumstances from which the officer concluded that the informant * * * was 'credible' or his information 'reliable.'

*United States v. Squella-Avendano*, 447 F.2d 575, 579 (5th Cir.), *cert. denied*, 404 U.S. 985, 92 S.Ct. 450, 30 L.Ed.2d 369 (1971). The state has failed to satisfy either of the *Aguilar-Spinelli* requirements for the establishment of probable cause through information supplied by an informant. While the factual inadequacy of the record presents an impediment to holding that Goodwin was under arrest at the moment he was told to get up and get dressed, the record does indicate that nothing transpired between the time Goodwin was taken from his home until detained at the station that established probable cause to arrest. Trial counsel was never aware of the lack of probable cause, nor was he aware of Thornton's testimony regarding the question of arrest until he heard it at trial.[21]

Trial counsel's concentration on the confession as involuntary was not the result of an informed decision. Rather, his challenge based on Goodwin's mental capacity as the only possibility for suppression was the product of an erroneous legal conclusion. Although he states many times in his state habeas corpus deposition that he believed Goodwin was illegally arrested, trial counsel's misunderstanding of the fruit of the poisonous tree doctrine led him to believe that an illegal arrest provided no foundation for suppressing a confession.[22] *See Herring v. Estelle*, 491 F.2d 125, 128 (5th Cir. 1974) (lack of familiarity with facts and law relevant to case causes counsel to fall below the minimum level required); *Caraway v. Beto*, 421 F.2d 636, 637 (5th Cir. 1970) (counsel is ineffective unless acquainted with facts and law of case).

Stemming from the revelation that probable cause to arrest was lacking, Goodwin claims the evidence obtained as a result of the illegal seizure, most notably, his confession, could have been suppressed. According to Goodwin, because trial counsel was unaware that an illegal arrest could affect the admissibility of a subsequent confession, his defensive efforts were directed toward events transpiring after the confession was obtained. Thus, the trial court was never called upon to address the legality of the arrest, nor was it requested to conduct an inquiry into the factors leading up to the confession to determine whether the deputy's conduct was so attenuated from the confession by the presence of intervening circumstances so as to render the confession reliable and hence, admissible.[23]

21. Although we decline to decide the merits of Goodwin's fourth amendment challenge on either a legal or factual basis, this does not foreclose our performance of the proper analysis for deciding the ineffective assistance claim. Our purpose in reciting the factual circumstances surrounding the deputy's actions is intended only for a better understanding of how these circumstances relate to the ineffective assistance argument. Because the circumstances present a multitude of unanswered questions, most notably, the question concerning probable cause to arrest or the lack thereof, it can hardly be said that Goodwin's trial counsel's inadequate investigation in this area enabled him to present an effective case. The essence of this lack of investigation lies in its prejudicial effect to Goodwin's defense.

22. On the arrest question, counsel's state habeas corpus deposition is somewhat conflicting. Although counsel states that he believed Goodwin to be illegally arrested, he also states that "they" didn't arrest Goodwin. This statement not only conflicts with counsel's previous assertions that Goodwin was illegally arrested, but also conflicts with Sheriff Thornton's testimony to the effect that Goodwin was considered under arrest when the deputies brought him into the sheriff's office early Saturday morning. The inconsistency is puzzling but not inexplicable considering the minimal effort spent investigating the facts and circumstances leading up to Goodwin's apprehension.

23. The Supreme Court conducted the attentuation inquiry without the benefit of the trial court's consideration of the question in *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). In *Brown*, the Court examined the connection between an unlawful arrest and subsequent incriminating statements and determined that in the absence of any "intervening event of significance," the statements were inadmissible. *Brown*, 422 U.S. at 604–05, 95 S.Ct. at 2262. In *Brown*, however, the Court approached the question in the context of an alleged fourth amendment violation. Because Goodwin's habeas corpus petition alleges a violation of his sixth amendment right, the admissibility *vel non* of his confession is not control-

We cannot state with a sufficient degree of assurance that the confession would have been suppressed had counsel realized the law provided an avenue for such a measure. Nevertheless, because the possibility of suppression existed, it cannot be said that trial counsel's ineffective preparation and investigation was "harmless beyond a reasonable doubt." *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967).

■ The magnitude of trial counsel's misunderstanding cannot go unnoticed or be deemed a common mistake by the average criminal lawyer. We hold trial counsel's ineffective assistance evidenced by his lack of thorough investigation deprived Goodwin of a potential defense. In addition, the decision to raise what would have been a credible challenge to the composition of the grand jury was unperceived. We

ling on the resolution of the ineffective assistance contention.

24. Our holding that counsel's ineffectiveness deprived Goodwin of his sixth amendment right to counsel reasonably likely to render effective assistance is in no way meant to be viewed as a hard and fast rule granting habeas corpus relief on ineffective assistance claims whenever a failure to investigate the facts and circumstances of a particular case occurs. The duty to investigate is not limitless and it does not necessarily follow that every time counsel fails to pursue all lines of inquiry will it mean that his assistance is ineffective. *Washington v. Watkins*, 655 F.2d at 1356. "[C]ounsel for a criminal defendant is not required to pursue every path until it bears fruit or until all conceivable hope withers." *Lovett v. Florida*, 627 F.2d 706, 708 (5th Cir. 1980). Based on the record before us, however, this is a case where habeas corpus relief is justified.

Under ordinary circumstances, when the state court has provided an opportunity for a full and fair adjudication of a fourth amendment claim, such as an unconstitutional arrest, the federal courts may not grant habeas corpus relief to a state prisoner on the ground that evidence obtained therefrom was introduced at his trial. This is the rule of *Stone v. Powell*, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1967). *Stone* requires that an opportunity for full and fair adjudication of a fourth amendment claim be provided at some point by the state court. If the petitioner deliberately bypasses his state opportunity or knowingly waives his fourth amendment objections, federal habeas corpus relief is precluded. *O'Berry v. Wainwright*, 546 F.2d 1204, 1213–14 (5th Cir.), cert. denied 433 U.S. 911, 97 S.Ct. 2981, 53 L.Ed.2d 1096 (1977).

cannot disregard these conspicuous errors. We therefore reverse and remand to the district court with directions to issue the writ of habeas corpus.[24]

## CONCLUSION

For the reasons specified in Part III, we reverse the district court's judgment insofar as it upholds the trial court's capital sentencing instructions. Accordingly, Goodwin's death sentence is set aside. *Spivey v. Zant*, 661 F.2d at 478–79. We reverse the district court's finding that Goodwin's trial counsel provided reasonably effective assistance. The case is remanded to the district court with directions to issue the writ of habeas corpus discharging Goodwin, subject to the state's right to retry him within a reasonable time. This time period shall be scheduled by the district court.

### REVERSED AND REMANDED.

Decisions subsequent to O'Berry indicate that "it is the existence of state processes allowing an opportunity for full and fair litigation of fourth amendment claims, rather than a defendant's use of those processes, that serves the policies underlying the exclusionary rule and bars federal habeas corpus consideration of claims under *Stone v. Powell.*" *Williams v. Brown*, 609 F.2d 216, 220 (5th Cir. 1980), citing *Caver v. Alabama*, 577 F.2d 1188 (5th Cir. 1978). See also *Swicegood v. Alabama*, 577 F.2d 1322, 1324–25 (5th Cir. 1978). Because our holding is based on Goodwin's sixth amendment claim of ineffective assistance of counsel, however, we find *Stone v. Powell* and its Former Fifth Circuit progeny inapplicable. The *Stone* Court was genuinely concerned with the costs and benefits of the exclusionary rule. The primary justification for the exclusionary rule is the deterrent effect on constitutionally impermissible police activity. As *Stone* indicates, however, illegal police conduct is not likely to dissipate with the threat of having evidence ruled inadmissible five years later in a federal habeas corpus proceeding. Therefore, under principles of federal-state comity, the federal court is an inappropriate forum to determine whether a fourth amendment violation exists for purposes of exclusion when the opportunity for that same determination has been previously provided in the state courts. See *Stone*, 428 U.S. at 489–95, 96 S.Ct. at 3050–53; *O'Berry*, 546 F.2d at 1214 nn.15 & 16. We find nothing in this line of reasoning, however, that prevents a federal court from determining whether a defense has been adequately investigated and prepared and therefore, whether defense counsel was effective.