**Son H. FLEMING, Petitioner,**

v.

**Walter ZANT, Warden, Respondent.**

**Civ. A. No. 81–68–VAL.**

United States District Court,
M.D. Georgia,
Valdosta Division.

March 25, 1983.

Kenneth A. Shapiro, Atlanta, Ga., for petitioner.

Nicholas G. Dumich, Atlanta, Ga., for respondent.

OWENS, Chief Judge:

Pursuant to laws passed by Congress giving a convicted state prisoner the legal right to apply to this United States District Court for a writ of habeas corpus "only on the ground that he is in [state] custody in violation of the Constitution ... of the United States," 28 U.S.C. § 2254, and requiring this court to consider his application, petitioner Son H. Fleming seeks a writ of habeas corpus overturning his conviction for the February 11, 1976, murder of Ray City, Georgia, Police Chief James Edward Giddens and the jury imposed-sentence of death therefor. Consistent with the adage that "perfect vision is 20/20 hindsight" petitioner Fleming's second set of *pro bono* habeas attorneys urge this court to "fly speck" petitioner's several trials, appeals and state habeas proceedings, and, because of technical alleged constitutional errors observable only with "perfect vision" and having no effect upon the constitutional fairness of Son Fleming's conviction or sentence, set aside his conviction and sentence. Having carefully read and considered the entire transcript of petitioner's state court proceedings together with ALL that has been submitted by petitioner's attorneys, and having concluded that petitioner has been constitutionally tried, convicted, and sentenced to die upon evidence—including his own unsolicited confession to a fellow

jail inmate—more than sufficient to convince any twelve jurors of his guilt beyond a reasonable doubt, this court, for reasons hereinafter stated, refuses to disturb his conviction for murder or his sentence of death. The reasons and the facts hereinafter stated represent this judge's *de novo* determination and rejection in whole of the findings and recommendations of the magistrate on the one issue addressed by the magistrate and further represent this judge's findings of fact and conclusions of law as to all remaining issues raised by petitioner and not included in the magistrate's proposed findings and recommendations. Rule 8(b), Section 2254 Rules.

### THE FACTS [1]

The murder of James Edward Giddens between 10:30 and 11:00 p.m. on February 11, 1976, near Lakeland, Lanier County, Georgia was the last of a series of crimes committed that night by petitioner Son H. Fleming and his accomplices, Henry Willis, III and Larry Donnell Fleming (petitioner's nephew), in three counties—Cook, Berrien and Lanier—of the southern central portion of Georgia. The following is a highlighted map of the area in question:

1. Recognizing the § 2254(d) presumptive correctness of the factual findings of the Superior Court of Tattnall County and the Supreme Court of Georgia, this factual summary is based upon those findings with additions consistent therewith as found by this court in the record of this case. *See, Sumner v. Mata,* 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981) and *Marshall v. Lonberger,* —— U.S. ——, 103 S.Ct. 843, 74 L.Ed.2d 646 (1983).

On the afternoon of February 11, 1976, petitioner Son H. Fleming, a black male then living at the Circus Motel in Moultrie, Colquitt County, Georgia, borrowed a 1968 red and white Fairlane Ford equipped with mag wheels and a jacked-up rear end, from his friend, Terry Coney, who also resided at the Circus Motel. Around nine o'clock that night petitioner, with his nephew, Larry Donnell Fleming, and Henry Willis, III as passengers, left Moultrie in the 1968 red and white Fairlane and drove to Adel, Cook County, Georgia, some 25 miles away. Petitioner, the only one possessing a driver's license, drove at all times. When they got to Adel, they drove to Jim's Minit Market for the purpose of robbing the store. Larry Fleming and Henry Willis, III got out of the car, went inside, and with guns robbed the store while petitioner waited in the car at a point where neither he nor the car could be seen by store personnel. The store manager gave them the store's currency and coin in a paper bag and they departed. At about 10:15 p.m. the police were notified of the robbery of the store and a report of the robbery was then broadcast over the area police radio.

James Edward Giddens, the Police Chief of Ray City, Georgia—situated some 14 miles easterly of Adel in the adjoining county of Berrien—was sitting in his police car in Ray City talking to a friend and listening to the police radio at the time the robbery report was broadcast. Soon thereafter he saw a vehicle with two black males as passengers, passing through town and decided to check it out. At 10:30 p.m. Chief Giddens reported by police radio that he was proceeding on Highway 129 east behind a red and white Ford with its back jacked up, tag number GBO 282, and two black males as passengers.

L.V. Dupree, the man with whom Chief Giddens was talking when the radio report was heard and when the Chief left in pursuit of the red and white Ford, became concerned when the Chief did not return to Ray City and went looking for him. At about 11:00 p.m. he found the Chief's police car sitting on the side of the road with its lights off and the Chief not in the car.

Using the police radio he notified the Nashville police dispatcher who immediately put out a lookout for the red and white Ford and dispatched others to the scene. Prior to that the dispatcher had unsuccessfully tried to reach Chief Giddens by radio.

Among the area law enforcement officers receiving the report of Chief Giddens' disappearance and the description of the red and white Ford, were two Brooks County Deputy Sheriffs who decided to assist by driving to the intersection of Highways 76 and 122 at Barney, Georgia and waiting there to see if they were needed. Around midnight they were advised by radio that a CBer had reported seeing the wanted car and was then following it on Highway 94 as it was passing through the nearby town of Morven. The deputies proceeded to the intersection of Highways 122 and 94, parked and waited. In a few minutes the wanted vehicle followed by the CBer came by on Highway 94. The deputies followed, pulled between the cars and after verifying the tag number of the Ford, pulled it over. Son Fleming, the driver, got out first and Henry Willis, III got out next. Only after Son Fleming and Willis were laying on the ground did one of the deputies see someone else in the car and require him to also get out. The third person was Larry Donnell Fleming. A search of the car resulted in two pistols—a .357 magnum issued to Chief Giddens and a .22—being found under the driver's seat; a paper sack containing currency and coin being found under the seat; and wet clothes being found in the trunk. The three apprehended black males denied knowing anything about Chief Giddens.

A massive search participated in by area law enforcement officers began soon thereafter and continued until Chief Giddens' uniform shirt was found hanging on a bush by the side of a road in Lanier County and his bullet-riddled body was found in the water of a nearby swamp around 5:00 a.m.

While the search was underway, the manager of the robbed Adel store had been taken to the point where the red and white Ford had been stopped and had identified

Larry Fleming and Henry Willis, III as the robbers. Larry Fleming, Henry Willis, III and Son Fleming were held under arrest. Later that day—February 12—they were taken before Justice of the Peace Henry Snead in Berrien County and advised of their rights, among other things, to a committal hearing and to a lawyer. (V. Nugent testimony, p. 40).

As will be more fully discussed, each of the three after being advised of his rights, made one or more statements to investigating officers in which Larry Fleming and Henry Willis, III admitted the participation of all three defendants in the Cook County robbery, the Berrien County kidnapping of Chief Giddens and the Lanier County murder of Chief Giddens. Son Fleming first denied even being with Larry and Henry during the robbery and kidnapping. Subsequently he admitted driving the car until they reached the swamp, at which point he said he begged Larry and Henry not to shoot Chief Giddens, and that he did not participate in the shooting.

On Monday, February 16, at 5:30 p.m. Larry Fleming, Henry Willis, III and Son Fleming were brought before Superior Court Judge H.W. Lott in Berrien County. He advised each of them of their right to an attorney: Larry Fleming said his family was trying to get him a lawyer; Henry Willis said to wait and see if he could get himself a lawyer; and Son Fleming said his mother was going to get him a lawyer. (Exhibit IX).

The next day—February 17—the already impaneled grand jury of Berrien County Superior Court indicted Larry Fleming, Henry Willis, III and Son Fleming for kidnapping with bodily injury, a capital felony. 1933 Ga.Code § 26–1311. (Exhibit XI). The grand juries of Cook and Lanier Counties had met and disbanded and new grand juries were to be impaneled in September and August preceding the regular term of Superior Court in October and September. Indictments for armed robbery and murder could only be returned by those grand juries. In the meantime they were held on the kidnapping indictment charges.

On February 24 at 3:15 p.m. Larry Fleming, Henry Willis, III and Son Fleming appeared again before Superior Court Judge Lott in Berrien County. Henry Willis asked for an appointed lawyer; Larry Fleming asked for an appointed lawyer; and Son Fleming asked for an appointed lawyer to serve until he could employ his own. M. Dale English, an attorney of Adel, Georgia, was appointed for Larry Fleming; George H. Wynn, an attorney of Lakeland, Georgia, for Henry Willis, III; and Edward Parrish, an attorney of Adel, Georgia, for Son Fleming. On April 30, 1976, each defendant appeared before the Superior Court of Berrien County with appointed counsel, was arraigned on the kidnapping with bodily injury indictment and pled not guilty. Trial was set for June 14. (Exhibit XI).

In the meantime, indictments had not been considered in Cook County for armed robbery and Lanier County for murder because their grand juries had not met. (Nugent testimony, p. 44).

From the time of their arrest and indictment until now each defendant was considered to be an indigent, offered and afforded appointed counsel, and afforded all that Georgia law furnishes indigents. Millard Farmer, an experienced Atlanta criminal defense lawyer then engaged 100% of the time as an employee of the Georgia Criminal Justice Council in defending indigent criminal defendants, was contacted by M. Dale English, Larry Fleming's appointed lawyer in the Berrien County kidnapping indictment charges, and asked to represent Larry Fleming. Mr. Farmer traveled to South Georgia, talked to Larry Fleming and agreed to represent him. He also was asked by Larry Fleming to represent Henry Willis and he agreed to do so. (Farmer's testimony, p. 32). Mr. Farmer was not appointed by the judge of the superior court to represent either Larry Fleming or Henry Willis.

Without contacting the lawyer appointed to defend petitioner Son Fleming in the Berrien County kidnapping with bodily injury indictment, Millard Farmer advised District Attorney Vickers Nugent that he

would be representing Larry Fleming and Henry Willis on all charges—indicted and unindicted—and requested a so-called committal hearing for them. Messrs. Farmer and Nugent then agreed to hold a hearing before a justice of the peace in Cook County, at which evidence as to all three charges—already indicted kidnapping with bodily injury and yet-to-be indicted armed robbery and murder—would be presented. Mr. Nugent notified petitioner's court-appointed counsel that the hearing would be held.

Petitioner's court-appointed counsel Edward Parrish is a veteran trial lawyer who practices in the small town of Adel, Georgia. He does not believe that so-called committal hearings are beneficial to criminal defendants and routinely does not request them or participate in such hearings requested by counsel for co-defendants. On this occasion he received Mr. Nugent's notice, decided that neither he nor Son Fleming would participate, but nevertheless went to the hearing to observe. Being a local lawyer in this rural area Mr. Parrish already knew almost as much about the case as the district attorney knew, and was in position to interview all witnesses without the compulsion of a court hearing. Mr. Farmer, being from Atlanta and new to the case, was uninformed about the case and needed all the help he could get. The agreed upon hearing was designed to make it unnecessary for Mr. Farmer to have to personally investigate the entire case.

The agreed upon hearing was held on May 14, 1976, in Adel, Cook County, Georgia before Justice of the Peace Dan Cowart. It was transcribed by the official court reporter for the Superior Court of the Alapaha Judicial Circuit—Atkinson, Berrien, Clinch, Cook and Lanier Counties.

The transcript—Exhibit III—shows:

(a) District Attorney Nugent appeared for the State and Millard C. Farmer, Jr., Senior Defender, Georgia Criminal Justice Council, Atlanta, Georgia, appeared "for the defendants."

(b) That the hearing "by agreement of counsel and by stipulation, . . . subject to correction by counsel for the Defendants, Millard Farmer . . ." was a committal hearing on armed robbery in Cook County charges against Larry Donnell Fleming and Henry Willis and on murder of James Edward Giddens in Lanier County charges against Larry Donnell Fleming, Son H. Fleming and Henry Willis III. As to the indicted kidnapping with bodily injury charges, the State, without conceding that they were entitled to a committal hearing on already indicted charges, stipulated that the hearing would proceed for discovery purposes. (Ext. III, p. 3).

(c) Mr. Farmer never announced nor even intimated that he was then representing only two of the three defendants.

(d) District Attorney Nugent presented and questioned witnesses as to the conduct of each of the three defendants, including in-custody statements made by each of them, and Mr. Farmer thoroughly cross-examined them as to everything known about each of the three defendants. Mr. Farmer called some witnesses and questioned them extensively as to each of the three defendants; Mr. Nugent then cross-examined each witness as to each defendant.

(e) Petitioner Son Fleming and the other two defendants were present and were identified by some witnesses. They, however, did not testify or say anything throughout the hearing.

(f) Mr. Farmer never suggested or argued that there was insufficient evidence to continue to hold each defendant in custody—the issue in a genuine committal hearing.

Petitioner was never tried for kidnapping with bodily injury. Instead, he was indicted in Lanier County Superior Court in August, 1976, for murder. After his indictment the court on August 12, 1976, appointed Reese Franklin, a Nashville, Georgia attorney who formerly served as an Assistant United States Attorney in this court, to represent petitioner on the indicted murder charge, and because of Mr. Franklin's disqualification on August 24, 1976, appointed Edward Parrish to also represent petitioner

on the murder charge. At about the same time petitioner's mother engaged Benjamin Zeesman, a Cordele, Georgia experienced lawyer, to also represent petitioner. Thereafter Mr. Parrish and Mr. Zeesman very ably represented petitioner.

At his December 13, 1976 arraignment petitioner pled not guilty. His trial started January 24, 1977 and ended January 26, 1977 with a finding of guilty and sentence of death.

On appeal to the Supreme Court of Georgia petitioner's attorneys, Messrs. Parrish and Zeesman, succeeded in overturning the death penalty because of prejudicial, improper prosecutorial argument and causing a sentencing re-trial. In its opinion affirming the conviction and reversing the death sentence the Supreme Court of Georgia fairly summarized the evidence presented at trial as follows:

"This is the direct appeal of the conviction and death sentence of Son H. Fleming, who was convicted of the murder of Police Chief James Giddens of Ray City, Berrien County.

"The state presented evidence from which the jury was entitled to find the following:

"Appellant borrowed a red and white Ford car from a friend on February 11, 1976. Around 10 or 10:30 p.m. that day a grocery store in Adel (Cook County) was robbed by two black males identified as Larry Fleming (appellant's nephew) and Henry Willis. One robber was armed with a nickel-plated .22 caliber gun. The stolen money was stuffed in a paper sack, and a carton of Kool cigarettes was also stolen.

"The red and white Ford (apparently occupied by two black males) passed through Ray City shortly after the robbery, and aroused the suspicion of Chief Giddens, who had heard of the robbery over his radio. Chief Giddens pursued the car, and reported a description (including the license plate number) of it by radio. Minutes later Giddens' police car was found abandoned by a friend with whom he had been talking prior to the pursuit. Giddens' disappearance was reported, and at 12:30 a.m. the red and white car was stopped; its three black male occupants (appellant, his nephew, and Willis) were arrested. Giddens' .357 magnum pistol, a nickel-plated .22 revolver, a brown sack of money, and a carton of Kool cigarettes were found in the car.

"Giddens' body was found in a pond in Lanier County. He had been shot several times. Powder burns and the patterns of ratshot from the .22 pistol indicated that some of the wounds were made at a range of less than 18 inches. One bullet recovered from the body was fired from Giddens' gun.

"After his arrest appellant made a number of statements. He initially stated that his nephew and Willis had borrowed the car from him before the robbery, and that he did not see them again until they picked him up shortly before the arrest.

"His next statement indicated that he had been picked up after the robbery, but before the pursuit by Chief Giddens. He stated that the three of them were stopped by Giddens, and when the policeman attempted to search the car he was overpowered and abducted by the other two. Appellant claimed that he was forced to drive the car while his nephew and Willis held Giddens at gunpoint. After Giddens told them of his report of the license number of the car, they drove to a remote area and let him out. When Giddens ran in an attempt to escape, both Larry Fleming and Willis shot at him. Giddens fell wounded into the nearby lake; Larry Fleming and Willis followed him there. Appellant heard additional shots. This statement also indicated that appellant begged the other two not to kill Giddens, and that he acted only out of fear of them.

"The testimony of a fellow inmate at the Cook County Jail indicated that appellant admitted driving the car while the others robbed the store, and that it was appellant who first shot at Giddens as he ran. At all times appellant has denied

having shot Giddens as he stood helpless in the water. Appellant denied making this last statement to the fellow inmate.

"Appellant's only evidence in defense was his own testimony, in which he returned to his first story. In the sentencing phase his counsel presented no additional evidence of mitigating circumstances, relying on the evidence at the guilt phase. Appellant's personal history sheet shows no convictions for serious or violent crimes, and a long history of employment (more than twenty years) in various jobs. He was 46 at the time of the murder." *Fleming v. State,* 240 Ga. 142, 240 S.E.2d 37 (1977).

Because of a motion for change of venue made by petitioner's attorneys, Messrs. Parrish and Zeesman, the sentencing retrial was held in the Superior Court of Cook County instead of in Lanier County. The jury again imposed the death penalty, and upon appeal by Messrs. Parrish and Zeesman it was affirmed. *Fleming v. State,* 243 Ga. 120, 252 S.E.2d 609 (1979). Certiorari was denied by the United States Supreme Court following which petitioner then represented by new pro bono counsel filed a petition for a writ of habeas corpus in Tattnall Superior Court. Following a hearing and written denial of said petition and unsuccessful appeal and application for writ of certiorari in the Supreme Court of the United States, this proceeding was commenced by a second set of new *pro bono* counsel.

## THE MAGISTRATE'S RECOMMENDATION

Among the many constitutional issues raised by counsel in the state habeas proceeding, and likewise raised in this court, is whether or not petitioner Son Fleming's Sixth Amendment right to the effective assistance of counsel was denied him during the May 14, 1976, "so-called" committal hearing, and, assuming it was, whether or not his conviction must be overturned and a new trial ordered.

■ Contrary to the magistrate's proposed findings, this United States District Judge finds that petitioner Son H. Flem-

ing's court-appointed counsel, Edward Parrish, was notified of said May 14, 1976, "so-called" committal hearing and as a matter of trial strategy decided that it would not be beneficial to his preparation of Son Fleming's defense of the indicted charge of kidnapping with bodily injury to participate with Millard Farmer in said hearing. Considering that petitioner's appointed counsel and Mr. Zeesman succeeded upon initial direct appeal and that Mr. Farmer, even with the aid of all that came out during said hearing, did not prevail for his clients, *Willis v. State,* 243 Ga. 185, 253 S.E.2d 70, *Fleming v. State,* 246 Ga. 90, 270 S.E.2d 185, this trial strategy can hardly be questioned. While petitioner's court-appointed counsel was present as an observer, neither he nor petitioner participated in said hearing. Petitioner was physically present, listened and was identified, but his mere presence did not constitute participation. Petitioner's mere presence is consistent with his court-appointed counsel's trial strategy decision not to participate in said hearing. *See, Williams v. Beto,* 354 F.2d 698 (5th Cir.1965); *Tuttle v. Decker,* 386 F.2d 814 (5th Cir.1967); *Worts v. Dutton,* 395 F.2d 341 (5th Cir.1968); *Fitzgerald v. Estelle,* 505 F.2d 1334 (5th Cir.1975); *Jackson v. Estelle,* 548 F.2d 617 (5th Cir.1977); *Ford v. Strickland,* 696 F.2d 804 (11th Cir.1983).

■ The "so-called" committal hearing that petitioner's attorney elected not to participate in was not in reality a committal hearing. Petitioner had been held from February 17, 1976, until the date of the hearing on a capital felony—kidnapping with bodily injury—indictment. Under Georgia law "the duty of the court of inquiry is simply to determine whether there is sufficient reason to suspect the guilt of the accused [who has been arrested with or without a warrant having issued and who has not been indicted], to require him to appear and answer before the court competent to try him; and whenever such probable cause exists, it is the duty of the court to commit." 1933 Ga.Code Ann. 27–407. Once an indictment has been returned judicial oversight of the decision to arrest and

prosecute ends, and there is neither a requirement nor a purpose for a 1933 Code § 27–407 committal hearing. The indictment by the grand jury is the finding of probable cause and the committal that would otherwise be the Code of 1933 § 27–407 court responsibility. *Bridges v. State,* 154 Ga.App. 811, 270 S.E.2d 60 (1980). By indictment for kidnapping with bodily injury this petitioner had been committed on and since February 17, 1976. Those charges by indictment being outstanding and untried, petitioner was not legally or constitutionally entitled to a hearing to inquire into the question of whether or not the state had evidence of the crime for which he stood indicted or of other crimes for which he would or could be indicted. *See, Pitts v. Hopper,* 402 F.Supp. 119, 122 (N.D.Ga.1974), *aff'd* 520 F.2d 941 (5th Cir. 1975). The fact that the prosecuting attorney and Mr. Farmer agreed and stipulated to hold a hearing and called a portion of it a committal hearing does not alter its true nature and purpose—an agreed upon discovery conference—or convert it into something not authorized or contemplated by law.

Petitioner vigorously differs with these conclusions. Assuming for the sake of argument that they are unfounded, petitioner overlooks the fact that the transcript of the May 14, 1976, hearing shows clearly that regardless of whether or not petitioner asked Mr. Farmer to represent him during the hearing, Mr. Farmer elected to do so and very capably did represent him along with Larry Donnell Fleming and Henry Willis, III. Mr. Farmer, without court request or appointment, came from Atlanta and assumed the responsibility for representing Henry Willis and Larry Donnell Fleming. Nothing said then by Mr. Farmer, petitioner, Larry Donnell Fleming, or Henry Willis indicated that Mr. Farmer had not also agreed to represent petitioner. Mr. Farmer's conduct on that occasion implied that he represented petitioner Son Fleming, Larry Donnell Fleming, and Henry Willis.

Mr. Farmer repeatedly referred to "the defendants" and never limited his remarks or contentions to "defendants Larry Donnell Fleming and Henry Willis." If Mr. Farmer did not then represent all three defendants, it was his responsibility as a member of the State Bar of Georgia and an officer of the court, having vast experience in defending criminals, to advise the court that he represented some but not all defendants; without such notice the court could hardly be expected to advise the petitioner that he was entitled to be represented by a lawyer appointed by the court and to determine whether or not petitioner desired appointed counsel as to possible additional charges. The fact that Mr. Farmer, some six years later, testifies in this court that he did not also represent petitioner does not alter the fact that his transcribed words and conduct indicated he did on May 14, 1976. The justice of the peace conducting the hearing was entitled to assume that Mr. Farmer represented all defendants, including petitioner. Neither petitioner [2] nor Mr. Farmer are entitled at this late date to "sand bag" the courts of this State by changing the stated facts surrounding the hearing that was arranged by AGREEMENT OF COUNSEL. The agreements of counsel stated in open court were and are binding upon all who participated in that hearing, including, but not limited to, petitioner.

The Supreme Court of the United States in 1967 in the case of *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705, considered the questions of "whether there can ever be harmless constitutional error and whether the error here [in *Chapman v. California*] was harmless ...." 386 U.S. at p. 20, 87 S.Ct. at p. 826. In answering those questions the Court first held that federal law governs and, having done so, stated:

"We are urged by petitioners to hold that all federal constitutional errors, regardless of the facts and circumstances, must always be deemed harmful. Such a

---

**2.** In spite of the fact that petitioner was present for his state habeas hearing and afforded an opportunity to testify, petitioner did not state

that he was without the benefit of a lawyer during the May 14, 1976, hearing.

holding, as petitioners correctly point out, would require an automatic reversal of their convictions and make further discussion unnecessary. We decline to adopt any such rule. All 50 States have harmless-error statutes or rules, and the United States long ago through its Congress established for its courts the rule that judgments shall not be reversed for 'errors or defects which do not affect the substantial rights of the parties.' 28 U.S.C. § 2111. None of these rules on its face distinguishes between federal constitutional errors and errors of state law or federal statutes and rules. All of these rules, state or federal, serve a very useful purpose insofar as they block setting aside convictions for small errors or defects that have little, if any, likelihood of having changed the result of the trial. We conclude that there may be some constitutional errors which in the setting of a particular case are so unimportant and insignificant that they may, consistent with the Federal Constitution, be deemed harmless, not requiring the automatic reversal of the conviction.

"In fashioning a harmless-constitutional-error rule, we must recognize that harmless-error rules can work very unfair and mischievous results when, for example, highly important and persuasive evidence, or argument, though legally forbidden, finds its way into a trial in which the question of guilt or innocence is a close one. What harmless-error rule all aim at is a rule that will save the good in harmless-error practices while avoiding the bad, so far as possible.

"The federal rule emphasizes 'substantial rights' as do most others. The California constitutional rule emphasizes 'a miscarriage of justice,' but the California courts have neutralized this to some extent by emphasis, and perhaps overemphasis, upon the court's view of 'overwhelming evidence.' We prefer the approach of this Court in deciding what was harmless error in our recent case of *Fahy v. Connecticut,* 375 US 85, 11 L ed 2d 171, 84 S Ct 229. There we said: 'The question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction.' Id., at 86–87, 11 L ed 2d at 173 [84 S.Ct. at 230]. Although our prior cases have indicated that there are some constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error, this statement in Fahy itself belies any belief that all trial errors which violate the Constitution automatically call for reversal. At the same time, however, like the federal harmless-error statute, it emphasizes an intention not to treat as harmless those constitutional errors that 'affect substantial rights' of a party. An error in admitting plainly relevant evidence which possibly influenced the jury adversely to a litigant cannot, under *Fahy,* be conceived of as harmless. Certainly error, constitutional error, in illegally admitting highly prejudicial evidence or comments, casts on someone other than the person prejudiced by it a burden to show that it was harmless. It is for that reason that the original common-law harmless-error rule put the burden on the beneficiary of the error either to prove that there was no injury or to suffer a reversal of his erroneously obtained judgment. There is little, if any, difference between our statement in *Fahy v. Connecticut* about 'whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction' and requiring the beneficiary of a constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained. We, therefore, do no more than adhere to the meaning of our *Fahy* Case when *we hold,* as we now do, *that before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt.* While appellate courts do not ordinarily have the original task of applying such a test, it is a familiar standard to all courts, and we believe its adoption will provide a more workable standard, although achieving the same result as that aimed at in our *Fahy* case." (emphasis added).

Assuming for the sake of further argument that contrary to this judge's findings and conclusions this petitioner was denied his Sixth Amendment right to assistance of counsel at the May 14, 1976, hearing, it would be the responsibility of this court, utilizing the Supreme Court's answer to the first question, to decide whether the error in denying petitioner the assistance of counsel was harmless.

Having carefully read and analyzed the entire transcript of the May 14, 1976, hearing and of the petitioner's trial and retrial, and having read and analyzed everything else that is included in this habeas proceeding, it is this judge's firm conclusion that the possible error of not affording someone other than, and in addition to, Millard Farmer as counsel for petitioner during the May 14, 1976, hearing was "harmless beyond a reasonable doubt." Unlike the circumstances of *Coleman v. Alabama,* 399 U.S. 1, 90 S.Ct. 1999, 29 L.Ed.2d 387 (1974), this hearing was held by agreement of counsel some three months after indictment. Mr. Farmer, an experienced criminal lawyer, appeared and represented petitioner's interest as effectively as he would have if appointed or retained to also represent petitioner. The justice of the peace had no authority to then refuse to bind over the indicted petitioner. The investigation of the crimes in question had been completed long before May 14, and, as is generally true in small communities, local lawyers already knew the details; only out-of-town counsel needed a discovery hearing. The evidence produced during the hearing was nothing more than an inventory of the completed investigation; it was nothing more than would have been revealed by the usual voluntary, informal discovery conference. While such a hearing, if it had been conducted soon after petitioner's arrest, may have been a "critical stage" of Georgia's criminal process against petitioner, *State v. Houston,* 234 Ga. 721, 218 S.E.2d 13 (1975), the three-months-after-indictment hearing arranged for by agreement of counsel for the purpose of discovery was not a "critical stage" in the criminal process against this petitioner. Paraphrasing Mr. Justice Har-

lan, mere speculation that separate defense counsel for petitioner might have been able to do better at trial had he been present with Mr. Farmer during the May 14, 1976, hearing, should not suffice to vitiate—make legally defective or invalid—petitioner's conviction. 399 U.S. at p. 20, 90 S.Ct. at p. 2009, 26 L.Ed.2d at p. 403. This petitioner has simply not alleged, testified, stated, or shown that anything that happened during the May 14, 1976, hearing turned out to be critical to the fairness of his trials. *See,* Mr. Justice Stewart's dissent 399 U.S. at p. 25, 90 S.Ct. at p. 2011, 26 L.Ed.2d at p. 406. *Holloway v. Arkansas,* 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978), speaks to a totally dissimilar set of circumstances and does not, in this judge's opinion, begin to require a different result in petitioner's case.

Even if petitioner was technically denied his Sixth Amendment right to counsel at the May 14, 1976, hearing, this court without any hesitation is able to declare its belief that such denial was harmless beyond a reasonable doubt.

### PETITIONER'S OTHER CONSTITUTIONAL CLAIMS

#### (a) *Sixth Amendment Right to Effective Assistance of Counsel.*

Petitioner contends that he was denied his Sixth Amendment guaranteed right to the effective assistance of counsel not only during the already discussed May 14, 1976, hearing but also during his trial for murder and during his sentencing re-trial. He asserts specific alleged deficiencies too numerous to list in this opinion. They begin on page 9 of petitioner's brief filed July 13, 1982, and continue through page 32.

As the Eleventh Circuit Court of Appeals recently stated in *Goodwin v. Balkcom,* 684 F.2d 794 at pp. 804–05 (11th Cir.1982):

"The oft-cited constitutional standard by which counsel's assistance is evaluated is well established. The sixth amendment, through the fourteenth, entitles a state criminal defendant the right to

counsel reasonably likely to render and rendering reasonably effective assistance. See, e.g., *Baty v. Balkcom,* 661 F.2d 391 (5th Cir.1981); *Nelson v. Estelle,* 642 F.2d 903 (5th Cir.1981); *Herring v. Estelle,* 491 F.2d 125 (5th Cir.1974). Effective assistance does not mean errorless assistance, nor counsel judged ineffective by hindsight. See, e.g., *United States v. Burroughs,* 650 F.2d 595 (5th Cir.1981); *Clark v. Blackburn,* 619 F.2d 431 (5th Cir.1980); *Easter v. Estelle,* 609 F.2d 756 (5th Cir. 1980). 'Rather, the methodology for applying the standard involves an inquiry into the actual performance of counsel conducting the defense and a determination of whether reasonably effective assistance was rendered based upon the totality of circumstances and the entire record.' *Nelson,* 642 F.2d at 906 (emphasis in original). See also *United States v. Gibbs,* 662 F.2d 728 (11th Cir.1981) (determination must come from entire record rather than specific actions). In applying this standard, no distinction is to be drawn between retained and appointed counsel. *Cuyler v. Sullivan,* 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980).

"Every case involving a constitutional claim of ineffective assistance of counsel turns on the facts and the conduct of those involved. *King v. Beto,* 429 F.2d 221, 222 n. 1 (5th Cir.1970). While counsel's performance need not be errorless, it must 'fall within the range of competency generally demanded of attorneys in criminal cases.' *Mylar v. State,* 671 F.2d 1299, 1301 (11th Cir.1982). See also, *Beckham v. Wainwright,* 639 F.2d 262, 267 (5th Cir.1981). The determination of whether the assistance rendered by counsel is reasonably effective, however, is not to be based solely upon his performance at trial. Consideration of the 'totality of circumstances' encompasses the quality of counsel's assistance from time of appointment or retention through appeal. At the heart of effective representation is the independent duty to investigate and prepare. '[C]ounsel have a duty to interview potential witnesses and "make an independent examination of the facts, cir-

cumstances, pleadings, and laws involved." ' *Rummel v. Estelle,* 590 F.2d 103, 104 (5th Cir.1979), quoting *Von Moltke v. Gillies,* 332 U.S. 708, 721, 68 S.Ct. 316, 322, 92 L.Ed. 309 (1948). Thus, '[a]n attorney does not provide effective assistance if he fails to investigate sources of evidence which may be helpful to the defense.' *Davis v. Alabama,* 596 F.2d 1214, 1217 (5th Cir.1979), vacated as moot, 446 U.S. 903, 100 S.Ct. 1827, 64 L.Ed.2d 256 (1980). '[T]he cornerstones of effective assistance of counsel' are the '[i]nformed evaluation of potential defenses to criminal charges and meaningful discussion with one's client of the realities of his case.' *Gaines v. Hopper,* 575 F.2d 1147, 1149–50 (5th Cir.1978).

"The assistance rendered may be deemed ineffective although the proceedings were not a farce or a mockery. *Herring,* 491 F.2d 125, 128 (5th Cir.1974). Nevertheless, *federal habeas corpus relief is proper only where a showing of prejudice accompanies the initial and distinct determination of ineffective assistance. This is true even in those cases where counsel's preparation and investigation have been adjudged woefully inadequate. Washington v. Watkins,* 655 F.2d 1346, 1356 [5th Cir.1981] . . . . " (emphasis added).

The proper standards for evaluating claims of ineffective assistance of counsel and the showing of prejudice that a habeas petitioner must make has recently been considered in *Washington v. Strickland,* 693 F.2d 1243 (5th Cir. Unit B *en banc,* 1982), in which the *en banc* court stated:

" . . . the petitioner has the burden of persuasion to demonstrate that the ineffective assistance created not only 'a possibility of prejudice, but that [it] worked to his actual and substantial disadvantage.' See *United States v. Frady,* 456 U.S. 152, 170, 102 S.Ct. 1584, 1596, 71 L.Ed.2d 816 (1982) (emphasis in original). If he successfully satisfies this burden, the writ must be granted unless the state proves that counsel's ineffectiveness was harmless beyond a reasonable doubt. See

*Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)...." 693 F.2d at 1258.

Petitioner was represented by court appointed and retained counsel. By hindsight petitioner's habeas counsel (who advised this court he has never tried a criminal case) has catalogued an almost endless list of things counsel could have but allegedly did not do. In evaluating these alleged deficiencies this court has read the entire record; considered the totality of circumstances; held two evidentiary hearings at which petitioner's attorneys, Edward Parrish and Benjamin Zeesman, and the prosecuting attorney testified and petitioner after being advised he could testify as to anything his lawyers were asked to do but did not do, elected on each occasion not to testify; appraised the extensive briefs submitted by counsel; and carefully analyzed and considered applicable appellate decisions.

In the real world that this petitioner committed murder and was tried and convicted in, lawyers—appointed or retained—are supposed to make an informed evaluation of potential defenses to criminal charges and to engage in a meaningful discussion of the realities of his case with the criminal defendant. This criminal defendant—the petitioner—has never suggested that his appointed and retained lawyers did not engage in a meaningful discussion of the realities of his case with him. When Mr. Parrish and Mr. Zeesman testified in this court, habeas counsel did not even attempt to prove a failure to engage in such meaningful discussion.

■ What potential defenses were there to the crime of murder? In view of petitioner's proven admissions to a fellow inmate in which he recited details that only a participant could have known and that were corroborated by independent evidence, counsel had the unenviable task of defending an almost hopeless case. It was almost hopeless because viewed realistically the direct and circumstantial evidence established defendant's guilt beyond a reasonable doubt. Messrs. Parrish and Zeesman never-

theless did a superb job of trying to convince two juries to spare petitioner's life. They rendered more than the effective assistance of counsel that he was constitutionally entitled to. In this court's considered judgment his arguments to the contrary are not valid.

There is always room for a difference of opinion as to whether or not counsel rendered the constitutionally required effective assistance of counsel. Without in any way suggesting there is a valid basis for such a difference of opinion in this case, those considering the contentions and arguments of petitioner should note that petitioner even though aware of *Washington v. Strickland, supra,* before said evidentiary hearings, has not—in this court's judgment—demonstrated that the alleged deficiencies of his lawyers "worked to his actual and substantial disadvantage." Even if he had so demonstrated, this mountainous record of evidence proving petitioner's guilt would demand a finding that counsel's ineffectiveness was harmless beyond a reasonable doubt.

#### (b) *Failure to Challenge the Grand Jury Array.*

■ Subsequent to petitioner's indictment and trial the grand jury array was successfully challenged by counsel for Henry Willis because of an insufficient representation of women. Henry Willis was then reindicted by a new grand jury, tried, convicted and sentenced to die. The challenge to the grand jury is just one of many technical objections interposed by counsel for Henry Willis that counsel for petitioner elected not to file or pursue. Though given the opportunity to do so before this judge, petitioner's very capable habeas attorneys did not even question Mr. Parrish or Mr. Zeesman as to their failure to challenge the composition of the grand or petit jury list. They simply rely on the fact that counsel for Henry Willis successfully challenged the same jury lists at a later time and suggest that Mr. Parrish and Mr. Zeesman should have done the same. Petitioner has not begun to carry his burden of persuasion on

this issue. Viewed in the light of the already stated standard for evaluating and judging the effective assistance of counsel, the failure to challenge the grand jury array did not amount to ineffective assistance of counsel.

(c) *Failure to Investigate and Present Evidence of Mitigating Circumstances.*

■ Counsel for petitioner has examined Messrs. Parrish and Zeesman as to their efforts made to investigate and present evidence of mitigating circumstances and has suggested that their lack of effort and failure to present such evidence demonstrates ineffective assistance of counsel "that worked to his [petitioner's] actual and substantial disadvantage."

To demonstrate the possibilities petitioner on February 22, 1983, filed affidavits signed by persons who state they were not asked to testify but would have willingly testified as to petitioner Flemming's non-violent, good character and his hard work for and devotion to his family. Bearing in mind that Son Fleming has resided in Moultrie, Georgia, for years, the affidavit of Mathis Rawls who resides in Rochelle, Georgia—some sixty miles away—is of his personal good opinion of petitioner; the affidavit of the Chief of the Moultrie Fire Department is that when petitioner worked for him in the 1950s petitioner "was a trusted employee and a good worker." He "had always known him to be a non-violent person." Other than the affidavit of a retired Rochelle, Georgia, school teacher who taught petitioner's sisters and has been a family neighbor in Rochelle, the other affidavits are from a sister, sister-in-law, and sister, each of whom would have told petitioner's life history favorably to petitioner. While all affiants asserted that petitioner's lawyers did not contact them or ask them to testify, petitioner given two evidentiary hearing opportunities to do so has not testified that he told his lawyers of the non-family affiants or asked them to permit family members to testify.

Mr. Zeesman testified that he investigated petitioner's alibi witnesses and found they did not support petitioner's assertion that he remained in Valdosta while Larry Fleming and Henry Willis robbed, kidnapped, and then murdered. He also investigated character witnesses but did not find them to be disposed to testify favorably. Wisely he did not call those he interviewed.

On March 17, 1983, respondent submitted the affidavits of five witnesses who could have been called to rebut testimony of petitioner's good character. To say the least they demonstrate that four Moultrie, Colquitt County law enforcement officers and an employee of Georgia Hide and Fur Company would have testified in no uncertain terms to petitioner's bad character and reputation for violence.

■ This court is concerned over the question of what are mitigating circumstances. Petitioner's attorneys suggest it is petitioner's life history and that counsel is ineffective unless petitioner's life history is investigated and presented to the jury. What is the answer to the question: What are mitigating circumstances to be presented to a jury in a Georgia death penalty case?

The most appropriate definition of mitigating circumstances is found in Bouvier's Law Dictionary, 3rd Edition, under mitigation:

"MITIGATION. Reduction; diminution; lessening of the amount of a penalty or punishment.

Circumstances which do not amount to a justification or excuse of the act committed may yet be properly considered in mitigation of the punishment: as, for example, the fact that one who stole a loaf of bread was starving."

Particularly appropriate is the example given—"the fact that one who stole a loaf of bread was starving." This suggests that mitigating circumstances include circumstances surrounding the commission of the crime as contrasted with the life history of the petitioner preceding the period of time possibly relevant to the commission of the offense in question. This is consistent with

the enumeration of possible mitigating circumstances in the Model Penal Code and quoted in fn. 44 of the Supreme Court's opinion in *Gregg v. Georgia:*

" '(4) Mitigating Circumstances.

'(a) The defendant has no significant history of prior criminal activity.

'(b) The murder was committed while the defendant was under the influence of extreme mental or emotional disturbance.

'(c) The victim was a participant in the defendant's homicidal conduct or consented to the homicidal act.

'(d) The murder was committed under circumstances which the defendant believed to provide a moral justification or extenuation for his conduct.

'(e) The defendant was an accomplice in a murder committed by another person and his participation in the homicidal act was relatively minor.

'(f) The defendant acted under duress or under the domination of another person.

'(g) At the time of the murder, the capacity of the defendant to appreciate the criminality [wrongfulness] of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect or intoxication.

'(h) The youth of the defendant at the time of the crime.' ALI, Model Penal Code § 210.6 (Proposed Official Draft 1962). 428 U.S. 153, 194, 96 S.Ct. 2909, 2935, 49 L.Ed.2d 859, 886 (1976). While this enumeration includes "no significant history of criminal activity," it obviously does not encompass the petitioner's life story as told not only by the petitioner but also by every friend and member of the family who wishes to testify.

Georgia statutory and case law does not define mitigating circumstances. 1933 Ga. Code § 27–2534.1, found to be constitutional in *Gregg v. Georgia, supra,* simply provides:

"(b) In all cases of other offenses for which the death penalty may be authorized, the judge shall consider, or he shall include in his instructions to the jury for it to consider, any mitigating circumstances or aggravating circumstances otherwise authorized by law and any of the following statutory aggravating circumstances which may be supported by the evidence:

\*     \*     \*     \*     \*     \*

(c) The statutory instructions as determined by the trial judge to be warranted by the evidence shall be given in charge and in writing to the jury for its deliberation. The jury, if its verdict be a recommendation of death, shall designate in writing, signed by the foreman of the jury, the aggravating circumstance or circumstances which it found beyond a reasonable doubt. In non-jury cases the judge shall make such designation. Except in cases of treason or aircraft hijacking, unless at least one of the statutory aggravating circumstances enumerated in section 27–2534.1(b) is so found, the death penalty shall not be imposed. (Acts 1973, pp. 159, 163.)"

Consistent with the views of the Supreme Court of the United States, to wit:

" ... we conclude that the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case,[11] not be precluded from considering as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.[12] We recognize that, in noncapital cases, the established practice of individualized sentences rests not on constitutional commands, but on public policy enacted into statutes. The considerations that account for the wide acceptance of individualization of sentences in non-capital cases surely cannot be thought less important in capital cases. Given that the imposition of death by public authority is so profoundly different from all other penalties, we cannot avoid the conclusion that an individualized decision is essential in capital cases. The need for treating each defendant in a capital case with that

degree of respect due the uniqueness of the individual is far more important than in noncapital cases. A variety of flexible techniques—probation, parole, work furloughs, to name a few—and various post-conviction remedies, may be available to modify an initial sentence of confinement in noncapital cases. The nonavailability of corrective or modifying mechanisms with respect to an executed capital sentence underscores the need for individualized consideration as a constitutional requirement in imposing the death sentence.[13]

"There is no perfect procedure for deciding in which cases governmental authority should be used to impose death. But a statute that prevents the sentencer in all capital cases from giving *independent mitigating weight to aspects of the defendant's character and record and to circumstances of the offense proffered in mitigation* creates the risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty. When the choice is between life and death, that risk is unacceptable and incompatible with the commands of the Eighth and Fourteenth Amendments.

---

[11] We express no opinion as to whether the need to deter certain kinds of homicide would justify a mandatory death sentence as, for example, when a prisoner—or escapee—under a life sentence is found guilty of murder. See *Roberts (Harry) v. Louisiana,* 431 US 633, 637 n 5, 52 L.Ed.2d 637, 97 S.Ct. 1993 [1995 n. 5] 5 Ohio Ops 3d 252 (1977).

[12] Nothing in this opinion limits the traditional authority of a court to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense.

[13] Sentencing in noncapital cases presents no comparable problems. We emphasize that in dealing with standards for imposition of the death sentence we intimate no view regarding the authority of a State or of the Congress to fix mandatory, minimum sentences for noncapital crimes." *Lockett v. Ohio,* 438 U.S. 586, 605, 57 L.Ed.2d 973, 990, 98 S.Ct. 2954, 2965 (1978) (emphasis added).

Georgia's statute as interpreted by the Supreme Court of Georgia permits a very broad range of evidence to be introduced as mitigating circumstances during the sentencing phase of the trial. Even evidence which is inadmissible under the rules of evidence during the non-sentencing phase may be admitted as evidence during the sentencing phase. Such evidence is not admissible in all instances. The decision is left to the discretion of the trial judge who must weigh the potential mitigating influence of the evidence against the harm resulting from violation of the evidentiary rule, resolving doubts in close cases in favor of admissibility. *Collier v. State,* 244 Ga. 553, 261 S.E.2d 364.

That Georgia law permits the introduction of such a wide range of evidence does not mean that mitigating circumstances includes everything that petitioner's sisters, sister-in-law, former employer, and school teacher family friend want to tell the jury or everything that petitioner's habeas attorneys dredge up seven years later.

As the Fifth Circuit Court of Appeals—Unit B indicated in *Washington v. Strickland, supra,* in presenting or not presenting mitigating evidence counsel for a defendant facing a possible death sentence must make an informed decision and exercise reasonable, good professional judgment in presenting such evidence as can possibly cause the jury to look upon a defendant as a person who, in spite of the atrocious crime he committed and was found guilty of, should be allowed to live.

It is apparent from the trial transcripts and from the testimony of petitioner's trial lawyers in this court that petitioner's lawyers had investigated every aspect of petitioner's case and of petitioner's life preceding the incident in question. Mr. Zeesman recalled, at this late date, going to Moultrie and talking to neighbors up and down the street to try to find character witnesses. He found none. Petitioner's mother who lived in Rochelle hired Mr. Zeesman and told him about petitioner. Neither petitioner nor his family has come forward to tell this court of any character witnesses known to Mr. Parrish or Mr. Zeesman at the time of either trial who would have given favorable testimony.

In examining the State's witnesses Mr. Parrish and Mr. Zeesman constantly brought out on cross-examination that while petitioner had been involved in minor scrapes with other people, he nevertheless was a non-violent person without a "significant history of prior criminal activity." They even portrayed him as the victim of a shooting and a person who would therefore be especially "turned off" by the thought of shooting someone else.

Trial counsel very wisely used the State's own witnesses to bring out mitigating circumstances and followed with the testimony of the petitioner. As viewed by this trial judge, his appearance is such as to possibly cause one or more jurors to think of him as a disabled, previously shot, facially scarred older man of limited education who could have been led astray by his younger nephew and nephew's friend.

■ Absent the perfect vision that no lawyer is possessed of, no lawyer can foretell what will or will not convince twelve jurors to have mercy and give a sentence of life instead of death in a case such as this. All a constitutionally effective lawyer can be required or expected to do is to make the informed decision of what mitigating evidence, if any, should be presented and how or through what witnesses it can most effectively be presented. Messrs. Parrish and Zeesman did all—indeed more than is required of constitutionally effective counsel in presenting mitigating circumstances to petitioner's jury through examination of the State's own witnesses and petitioner's testimony.

Having viewed petitioner's complaint of counsel's ineffective assistance both generally and particularly, it is this judge's considered judgment that petitioner was not denied effective assistance of counsel at any time.

### (d) *Sufficiency of the Evidence*

■ The evidence as found by the Supreme Court of Georgia and already recited has been considered in accordance with the Supreme Court's *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), standard of review to be applied in this federal habeas proceeding—"whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt ...," 443 U.S. at 319, 99 S.Ct. at 2789, 61 L.Ed.2d at 573. After such consideration there is no doubt in this judge's mind that any rational trier of fact from the presumptively correct facts found by the Supreme Court of Georgia, viewed most favorably to the prosecution, could have found the essential elements of the crime of murder beyond a reasonable doubt.

### (e) *Other Constitutional Claims.*

Petitioner's counsel on Page 2 of his brief submitted to this court summarized his many constitutional complaints into the following categories:

"—Mr. Fleming (sic) was denied his Sixth Amendment right to counsel at his May 14, 1976 committal hearing

—Mr. Fleming (sic) was denied his Sixth Amendment right to effective assistance of counsel during his initial trial (Lanier County) and the second sentencing trial (Cook County

—Mr. Fleming's (sic) death sentence violated the Eight and Fourteenth Amendments because the sentencing jury was given inadequate guidance and because the Georgia death penalty statute is racially discriminatory as applied and therefore unconstitutional

—The State's failure to produce material exculpatory evidence deprived Mr. Fleming (sic) of his rights under the Fifth and Fourteenth Amendments

—the jury that sentenced Mr. Fleming (sic) to death was not impartial and was improperly composed, in violation of the Sixth and Fourteenth Amendments

—A series of other constitutional (sic) violations deprived Mr. Fleming (sic) of due process of law and warrant the granting of habeas corpus relief."

The first two categories having been considered and found to be without merit, is

there any merit to the remainder of his constitutional grievances? Having examined each of the remainder and considered the entire record, it is this court's opinion that the presumptively correct facts as found by the Supreme Court of Georgia and the state habeas court, and the decisions of the Supreme Court of the United States and of the State of Georgia show there is no possible merit to any of petitioner's remaining claims.

■ The Supreme Court of the United States in 1976 found that the death penalty "does not invariably violate the [United States] Constitution," 428 U.S. at 169, 96 S.Ct. at 2923, and that Georgia's statutory procedure for determining whether or not the death penalty should be imposed in a particular case is constitutional. *Gregg v. Georgia, supra.* In so holding, the Supreme Court, among other things, stated:

"... capital punishment is an expression of society's moral outrage at particularly offensive conduct. This function may be unappealing to many, but it is essential in an ordered society that asks its citizens to rely on legal processes rather than self-help to vindicate their wrongs.

'The instinct for retribution is part of the nature of man, and channeling that instinct in the administration of criminal justice serves an important purpose in promoting the stability of a society governed by law. When people begin to believe that organized society is unwilling or unable to impose upon criminal offenders the punishment they "deserve," then there are sown the seeds of anarchy—of self-help, vigilante justice, and lynch law.' *Furman v. Georgia,* supra [408 U.S. 238] at 308, 33 L.Ed.2d 346, 92 S.Ct. 2726 [2761] (Stewart, J., concurring).

'Retribution is no longer the dominant objective of the criminal law,' *Williams v. New York,* 337 U.S. 241, 248, 93 L.Ed. 1337, 69 S.Ct. 1079 [1083] (1949), but neither is it a forbidden objective nor one inconsistent with our respect for the dignity of men. *Furman v. Georgia,* 408 U.S. at 394–395, 33 L.Ed.2d 346, 92 S.Ct. 2726 [2806] (Burger, C.J., dissenting); id., at 452–454, 33 L.Ed.2d 346, 92 S.Ct. 2726 [2835–2836] (Powell, J., dissenting); *Powell v. Texas,* 392 U.S. [514] at 531, 535–536, 20 L.Ed.2d 1254, 88 S.Ct. 2145 [2155–2156]. Indeed, the decision that capital punishment may be the appropriate sanction in extreme cases is an expression of the community's belief that certain crimes are themselves so grievous an affront to humanity that the only adequate response may be the penalty of death."

There being no constitutional impediment to this "expression of the community's belief that certain crimes are themselves so grievous an affront to humanity that the only adequate response may be the penalty of death," petitioner's application for a writ of habeas corpus to set aside his conviction and death sentence is hereby DENIED.